977 P.2d 39 (1999)
95 Wash.App. 686
STATE of Washington, Respondent,
v.
L.K., B.D. 05-02-81, Appellant.
No. 42824-1-I.
Court of Appeals of Washington, Division 1.
May 17, 1999.
*40 Eric Broman, Nielsen Broman & Associates, Seattle, Counsel for Appellant.
Kristin E. Sweeney, King County Deputy Prosecutor, Seattle, Counsel for Respondent.
*41 AGID, A.C.J.
L.K. appeals the trial court's order denying her motion to suppress narcotics the police found after they stopped and frisked her. Because the officers were legitimately concerned for the welfare of a young girl who was out late on a school night accompanied by known narcotics users in a high narcotics trafficking area, and there is no evidence of a pretext stop, we affirm.

FACTS
At about 10:10 p.m. on March 3, 1998, a school night, Seattle Police Officers Jennings and Kim were on uniformed bicycle patrol in downtown Seattle.[1] They saw L.K., who was accompanied by two females and an older male, at the corner of Third Avenue and Stewart Street. They focused on her because of her youthful appearance, it was a school night, and Third and Stewart is known to the officers as a high narcotics trafficking area. Officer Jennings recognized the older male from previous narcotics contacts, and Officer Kim recognized L.K.'s three companions as having been involved in an earlier narcotics buy-bust operation.
L.K. appeared to Officer Jennings to be between 11 and 13 years old,[2] and much smaller than her three companions who appeared to be in their early 20's. L.K. was the only person of that age on the street at that time of night, and the officers both thought L.K. was a youth at risk. Officer Kim routinely stops and speaks with children under 18 years old who are on the street at night.
Officer Jennings asked L.K. to stop and speak with him. L.K. ignored him and kept walking; the other three stopped. Officer Jennings repeated his request, but L.K. put her head down and continued walking, so Officer Jennings stopped L.K. by taking hold of her arm.
The officers asked L.K. her age and name. She eventually told them she was 16 years old, but they did not believe her because she looked so young. L.K. acted nervous and put her hands into her coat four different times even though the officers asked her to keep her hands in view. Officer Jennings told her that if she did not keep her hands in view, he would pat her down. When L.K. did not comply, Officer Jennings patted her down for weapons. He felt a hard object in an inside pocket of L.K.'s jacket and asked her to open the jacket so he could get to it.[3] As soon as L.K. unzipped the jacket, Officer Jennings saw what he suspected to be white-or cream-colored flecks of rock cocaine on its black lining. He recognized the substance from his experience with narcotics and many narcotics-related arrests and knew that the flecks were not lint or crumbs of food. The flecks field tested positive for cocaine. After L.K. was arrested, Officer Kim found 1.4 grams of cocaine in her bra.
L.K. was charged with one count of possession of cocaine. The trial court held a fact-finding hearing and a hearing on L.K.'s motion to suppress the cocaine. It denied her motion and found she committed the offense. The court's written conclusions state:
I. REASONS FOR THE ADMISSIBILITY OF THE EVIDENCE SOUGHT TO BE SUPPRESSED:
1. The court finds that the Officers had a reasonable basis for approaching and questioning the Respondent to determine her age and whether she a[sic] youth at risk.
2. The court finds that due to the Respondent's perceived height of 4'9" (verified as 5'1" at fact finding), perceived age of between 11 and 13, the late hour, her presence in a high narcotics area, the fact that she was in the company of a person associated with narcotics, all added to provide the officers with proper grounds to *42 approach the Respondent as a youth at risk.
3. The court finds that due to her furtive movements, bulky clothing and refusal to keep her hands in view, there was a reasonable and grounded concern for officer safety which prompts and justifies a pat-down for weapons.
4. The court finds that Officer Jennings acted reasonably when he requested the Respondent to keep her jacket open so he could see where her hands were.
5. The court finds that the Officers were lawfully engaging the Respondent based on their concerns for her safety as a potential youth at risk.
6. The court finds that [O]fficer Jennings saw, in plain view, what he thought to be particles of rock cocaine on the black lining of the Respondent's coat.
7. The court finds that Officer Jennings could differentiate between the suspected narcotics and other items such as lint or food crumbs because of his experience, both on the street and formal training, in the area of narcotics.
8. Relevant factors considered by the court, were taken in light of the circumstances at hand and the officers training and experience.
9. The court finds the testimony of the officers credible.... [[4]]
The court also incorporated its oral findings and conclusions in its written findings. A timely appeal followed.

DISCUSSION
L.K. argues that the evidence established that (a) the arresting officers had no valid basis to stop her, (b) the pat-down search was not justified by officer safety concerns, and (c) the officers' pat-down exceeded its proper scope. We hold that the officers' actions were justified by the surrounding circumstances and their role as community caretakers and that the pat-down was proper.
Warrantless seizures are per se unreasonable under the Fourth Amendment of the United States Constitution and Article 1, section 7 of the Washington Constitution.[5] Under the Fourth Amendment, a person is seized "when restrained by means of physical force or a show of authority."[6] We agree with L.K. that she was seized when Officer Jennings took hold of her arm after she ignored the officers' requests that she stop.
The State bears the burden of proving that a warrantless seizure falls within one of the "`"jealously and carefully drawn" exceptions'" to the warrant requirement.[7] One of those exceptions is the "community caretaking function" in which an officer makes a citizen contact unrelated to any criminal investigation.[8] To determine whether a community caretaking encounter between an officer and a citizen is reasonable, a court must balance
the individual's interest in freedom from police interference against the public's interest in having the police perform a "community caretaking function".[[9]]
In this case, the issue is whether the officers were properly performing this function when they stopped L.K.
As a preliminary matter, we cannot overemphasize the potential for abuse of the community caretaking warrant exception, particularly in the context of protecting child *43 welfare. At oral argument, L.K. correctly noted that unfettered police interference with juveniles at night creates a de facto curfew law, the formal version of which we have rejected as unconstitutional.
[C]ourts have struck down ... curfew ordinances because their reach was too broad.... [Because] the number of juveniles engaged in safe and innocent activity almost certainly outnumbers those engaged in criminal activity, ... courts have held that confining all of them to their homes or a few designated activities without evidence that such Draconian restrictions were necessary to address juvenile crime is not a narrowly tailored response to the problem.[[10]]
The balancing test we apply to determine whether the police are in fact exercising their community caretaking function reflects these concerns by requiring a court to review the extent to which an individual's interest in freedom from police interference has been violated.[11] It ensures that police do not abuse this function with "shake downs," pretext stops or undue interference with juveniles' rights to privacy and travel.
Against these principles we must balance legislative expressions of the public interest in protecting children. Because this case involved a narcotics trafficking area, we focus particularly on the concern that children not be involved with illegal drugs. State and local laws encourage police to inquire into and prevent children from having contact with drugs. For example, it is a criminal offense to involve a person under 18 years old in a drug transaction;[12] to provide a person under 18 with drug paraphernalia;[13] and to conduct drug transactions in or within 1,000 feet of schools, of school bus stops, or in school buses or public parks.[14] In addition, Seattle Police Officers are specifically charged with investigating juvenile delinquency.[15] These laws all reflect the legislative policy that police officers look out for the safety of children, particularly when they may be exposed to drugs. Here, the record establishes that the officers' sole concern was for L.K.'s welfare, and the circumstances spoke loudly of the possibility that she was involved with people known to be involved with drugs.
Both officers worked the night shift, 7 p.m. to 4 a.m. As we noted earlier, Officer Kim makes a point of speaking to children under the age of 18 who are out late at night. Officer Jennings testified that he stopped L.K. because
[w]e wanted to find out how old she was and to do a check for her safety and question her why she was downtown, what her purpose was, who she was with, was she with family, was she by herself, does she know these people, those kind of questions.
He believed that L.K. might be a youth at risk[16] because she looked so young, was accompanied by a known drug user, and was out late on a school night. In addition, L.K.'s three companions appeared to be much older. Officer Kim testified that L.K. appeared to be much younger than 16, and was much shorter than her companions. In addition, L.K. was the only person in the area of such youthful appearance. All three companions had been arrested before in a buy-bust operation.
Under these circumstances, the trial court correctly ruled that L.K.'s interest in being free of police interference was outweighed by the officers' legitimate attempt to find out if she was in trouble. Because she would not stop long enough to let them perform this *44 function, the initial seizure of L.K. was justified.
L.K. also asserts that officers should not be allowed to use their role as community caretakers to circumvent constitutional requirements. But there is no evidence in the record that the stop was a pretext for an illegal search.[17] Instead, the officers made an individualized determination that L.K.'s welfare might be in jeopardy based upon the constellation of circumstances we described above. Taken together, these facts establish a legitimate basis for the officers' exercise of their community caretaking function.[18]
L.K. argues that once she told the officers her age, the encounter should have ended. But her argument ignores the circumstances of the encounter. Public policy supports the trial court's conclusion that the officers' actions were reasonable, given their concerns that L.K. was at risk. As part of their community caretaking function, the officers were entitled to satisfy themselves that L.K. was not in danger.
A contrary ruling would insulate criminals who prey upon children by involving them in prostitution, sexual exploitation and narcotics trafficking. Children subject to the influence and control of such people may well be afraid to come forward because they fear the repercussions. Public policy mandates that when officers become aware of a specific juvenile who may be at risk, they should be allowed to inquire into that child's welfare as a valid part of their community caretaking function.
Because we hold the seizure was proper, we must also address L.K.'s challenge to the frisk. Protective frisks of suspects temporarily in police custody are justified where officers have reasonable safety concerns based on "`specific and articulable facts' which create an objectively reasonable belief that a suspect is `armed and presently dangerous.'"[[19]] Reviewing courts
are reluctant to substitute their judgment for that of police officers in the field. "A founded suspicion is all that is necessary, some basis from which the court can determine that the [frisk] was not arbitrary or harassing."[[20]]
Factors that justify a protective frisk include any furtive gestures and movements the person makes in response to the officers' presence, the location of the suspect-officer contact, the time of day, whether the person ignored officers' requests to stop and whether his or her clothing could conceal a weapon.[21]
Under the Walker factors, these officers had a reasonable belief that L.K. could be carrying a weapon. They saw her at 10:10 p.m. She refused to look at the officers when they approached her and refused to stop when the officers asked to speak with her. During her contact with the officers, L.K. reached into her pockets four different times, despite requests that she keep her hands visible. And her jacket, a large "puffy" down jacket, could easily conceal a weapon. There was a legitimate basis for the officers' concerns for their safety.
L.K. cites State v. Terrazas[22] in support of her argument, but Terrazas is not persuasive. It involved a traffic stop in which a back-seat passenger had his hands under a blanket that covered his lap on a cold evening. Throughout the investigation and arrest process, the passenger remained in the *45 rear seat of the car, did not move or make any furtive gestures, was calm, and answered all questions from the officers.[23] The court held these facts were insufficient to establish a reasonable belief that the passenger was armed and dangerous.[24] Here, the officers' safety concern was objectively reasonable. L.K. made furtive gestures, would not stay still, was uncooperative, and was agitated.[25]
L.K. also challenges the scope of the frisk, arguing that Officer Jennings' request that she unzip her jacket was not justified. We hold that the officers did not exceed the valid scope of the frisk.
The scope of a Terry frisk is limited to its protective purpose.[26] Here, Officer Jennings testified on direct examination that when he frisked L.K. he felt a hard object: "It was felt on the outside, but the pocket was on the inside, so I asked [L.K.] to unzip her jacket so we could expose the area where the possible weapon could be." L.K. unzipped her coat, and the officer discovered the item in the inside pocket was a comb or brush. Officer Jennings saw the suspected cocaine as soon as she unzipped her jacket. Having felt a hard object which could have been a weapon, the officer was justified in finding out what it was. The request that L.K. unzip her jacket was therefore within the permissible scope of the frisk. The simultaneous plain view observation of the flecks of suspected cocaine and their seizure were proper.[27]

CONCLUSION
We hold that where there is no evidence that an encounter between an officer and a juvenile is a pretext for an impermissible investigation and the circumstances surrounding the encounter demonstrate that the purpose of the officers is to ensure the safety and welfare of the juvenile, the officers have properly exercised their community caretaking function. We affirm the juvenile court's order denying L.K.'s motion to suppress and the conviction.
APPELWICK, J., concurs.
BAKER, J. (dissenting).
I respectfully dissent. The "community caretaking function" as an exception to the constitutionally required basis for the seizure of a citizen by police has never been so broadly or loosely described in the case law, nor should it be.
As the parties agree, L.K. was seized by the police as she was walking on the sidewalk of a major downtown Seattle street at about 10 PM on a weeknight. She was seized after she made clear by her actions that she did not choose to engage in a consensual encounter with uniformed Seattle Police Officers.
Prior to and at the time of her seizure, neither L.K. nor any of the three persons with whom she was walking had acted in any way suspiciously. There was no indication whatsoever that any drug related activity was occurring. There was nothing unusual about the conduct of any one of the four persons, nor was anything unusual observed about the interaction between L.K. and the others. There was nothing to justify an intrusion on the basis of exigent circumstances.
What were the factors that led to L.K.'s seizure? Although she was just short of 17 years old, the officers thought she could have been between 11 and 15. One of the three persons she was with was recognized as having a prior narcotics arrest.[28] She was walking *46 in an area of Seattle known to have drug activity.[29] It was about 10 PM. She did not choose to stop and talk to the police. No previous case anywhere has held that such factors, or anything close to them, justify the seizure of a citizen.
The majority opinion's focus on laws relating to drugs and persons under 18 years of age and the responsibility of the police to investigate juvenile delinquency is beside the point. There was no observed drug related activity, and certainly nothing to indicate juvenile delinquency was afoot. Although there was nothing to indicate L.K. was "in trouble," the officers nonetheless chose to interfere with her rights to privacy and movement. Notwithstanding the majority's discussion on public policy factors, I do not agree that the proper balance between those factors and L.K.'s freedoms is apparent in the outcome of this case.
What is apparent, as admitted by one of the officers, was that the officers were suspicious of possible criminal activity because of the time, the location, and the fact that L.K. did not want to talk. Such suspicions would not justify a Terry stop, and the State does not try to justify the seizure on that basis. Instead, the State argues that the seizure of L.K. was permitted by the "community caretaking function" exception to search and seizure constitutional requirements.
Judicial characterization of some police actions as community caretaking functions has its genesis in Cady v. Dombrowski.[30] Such activities were initially described as "totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute."[31] Thereafter, the caretaking exception has been considered mostly in cases dealing with automobile impoundment.[32] No case cited by the State or by the majority has ever utilized this limited and cautiously applied exception to Fourth Amendment rights to justify the seizure of a person, much less on such flimsy grounds as these.
It is ironic that this court recently invalidated a youth curfew ordinance, ruling that minors have the same fundamental right of freedom of movement that adults have.[33] It is quite difficult to logically correlate that holding with the extravagant and completely unsupported assertion in the majority's opinion that a "contrary ruling [in this case] would insulate criminals who prey upon children by involving them in prostitution, sexual exploitation and narcotics trafficking."[34]
Finally, the facts in this case are that the other three persons with L.K. stopped voluntarily when approached by the police. Any desire by the police to clarify the situation could certainly have been satisfied by querying those individuals. But, if any ofthem had decided not to stop and talk to the police, they most certainly could not have been constitutionally seized by the police. I can see no valid basis for the seizure of L.K., either. I would reverse.
NOTES
[1] The facts are derived from the written findings of fact and conclusions of law from the suppression hearing. None of the written findings are challenged. They are therefore verities on appeal. State v. Stenson, 132 Wash.2d 668, 697, 940 P.2d 1239 (1997), cert. denied, ___ U.S. ___, 118 S.Ct. 1193, 140 L.Ed.2d 323 (1998).
[2] Officer Kim thought that L.K. could have been between 13 and 15.
[3] The object in L.K.'s pocket turned out to be a comb or brush. For his safety, Officer Jennings had L.K. keep her coat open after he discovered it.
[4] The State has moved to supplement the Clerk's Papers with the written findings and conclusions signed by the factfinding judge on July 30, 1998, and apparently misfiled in another superior court case on August 12, 1998. The motion is granted.
[5] State v. Williams, 102 Wash.2d 733, 736, 689 P.2d 1065 (1984).
[6] State v. Thorn, 129 Wash.2d 347, 351-52, 917 P.2d 108 (1996). L.K. mentions, but does not present argument regarding, Article 1, section 7. This court will not, therefore, consider whether L.K. is provided greater protection under our Constitution. See Thorn, 129 Wash.2d at 352 n. 3, 917 P.2d 108.
[7] State v. Houser, 95 Wash.2d 143, 149, 622 P.2d 1218 (1980) (quoting Arkansas v. Sanders, 442 U.S. 753, 759, 99 S.Ct. 2586, 61 L.Ed.2d 235 (1979)).
[8] State v. Mennegar, 114 Wash.2d 304, 313, 787 P.2d 1347 (1990).
[9] Id.
[10] State v. J.D., 86 Wash.App. 501, 508-09, 937 P.2d 630 (1997).
[11] Mennegar, 114 Wash.2d at 313, 787 P.2d 1347.
[12] RCW 69.50.401(f).
[13] RCW 69.50.412(3).
[14] RCW 69.50.435(a)(1-5).
[15] See, e.g., SMC 12A.18.010 et seq., which criminalizes (a) contributing to a child's abuse or neglect, and (b) contributing to a child's delinquency.
[16] We do not use the term "youth at risk" as a term of art. No evidence was presented, and the parties did not argue, that L.K. was an at-risk youth who had absconded from a juvenile dependency proceeding. See RCW 13.32A.
[17] L.K. cites State v. Richardson, 64 Wash.App. 693, 694, 825 P.2d 754 (1992), in support of her argument. But the case is inapplicable. Richardson was not a juvenile, so the court had no reason to address child safety policy concerns. Id.
[18] The officers' individualized determination that L.K. could have been in danger distinguishes this case from State v. J.D., where we invalidated a curfew ordinance founded on a generalized assumption that all juveniles contribute to crime in an area, or would necessarily be victimized if present in the area after hours.
[19] State v. Collins, 121 Wash.2d 168, 173, 847 P.2d 919 (1993) (quoting Terry v. Ohio, 392 U.S. 1, 21-24, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)).
[20] State v. Belieu, 112 Wash.2d 587, 601-02, 773 P.2d 46 (1989) (quoting Wilson v. Porter, 361 F.2d 412, 415 (9th Cir.1966)) (emphasis in original).
[21] State v. Walker, 66 Wash.App. 622, 630-31, 834 P.2d 41 (1992).
[22] 71 Wash.App. 873, 863 P.2d 75 (1993), review denied, 123 Wash.2d 1028, 877 P.2d 695 (1994).
[23] Id. at 874-75, 863 P.2d 75.
[24] Id. at 879, 863 P.2d 75.
[25] L.K. also cites State v. Alcantara, 79 Wash. App. 362, 364-65, 901 P.2d 1087 (1995). In Alcantara, the court ruled that a Terry frisk is improper where it is conducted solely because the frisking officer believed Alcantara was in possession of illegal drugs. Because Alcantara did not address a protective frisk, it does not apply here.
[26] Collins, 121 Wash.2d at 173, 847 P.2d 919.
[27] See State v. Kennedy, 107 Wash.2d 1, 9, 726 P.2d 445 (1986) (officers lawfully in a protected area may seize contraband they perceive with their senses, where the contraband is immediately recognizable as such by the officers).
[28] The fact that a person has previously been arrested for narcotics possession is not probable cause to believe that person is committing a crime. See State v. Hobart, 94 Wash.2d 437, 446-447, 617 P.2d 429 (1980). Obviously, a person's association with someone previously arrested does not provide any basis to seize that person.
[29] The fact that a person is present in an area which has a history of crime is also irrelevant for purposes of probable cause. See State v. Ellwood, 52 Wash.App. 70, 74, 757 P.2d 547 (1988).
[30] 413 U.S. 433, 93 S.Ct. 2523, 37 L.Ed.2d 706 (1973).
[31] Cady, 413 U.S. at 441, 93 S.Ct. 2523.
[32] See, e.g., State v. Houser, 95 Wash.2d 143, 152, 622 P.2d 1218 (1980), where our Supreme Court held that the exception could not be used to justify the seizure of an automobile merely because the police suspected it might be stolen; State v. Mennegar, 114 Wash.2d 304, 309, 787 P.2d 1347 (1990), which held that police could check for a valid operator's license before turning a car over to a passenger in a vehicle validly stopped for a traffic violation where the driver was inebriated.
[33] State v. J.D., 86 Wash.App. 501, 507, 937 P.2d 630 (1997).
[34] The majority cites no authority for this proposition. Moreover, it is worth noting that L.K. walked away from the three individuals who stopped and spoke with the police. Although the officers were familiar with those individuals, the record does not indicate that the officers were familiar with L.K., that she was involved in any illegal activities, or that she was being exploited or restrained in any way. Thus, it is not apparent that "the officers were entitled to satisfy themselves that L.K. was not in danger."