[Nos. 17205-8-III; 17206-6-III. Division Three. January 25, 2000.]

THE STATE OF WASHINGTON, *Appellant*, v. DANIEL WILLIAM COYNE, *Respondent*.

THE STATE OF WASHINGTON, *Appellant*, v. CLINTON JOSEPH BURT, *Respondent*.

*Andrew K. Miller,* Prosecuting Attorney, and *John V. Jensen, Deputy,* for appellant.

*Daniel William Coyne,* pro se.

*Nicholas W. Marchi* of *Carney & Marchi,* for respondent Burt.

BROWN, J. — Daniel W. Coyne and Clinton J. Burt successfully sought suppression of drug evidence discovered following a consent search that flowed from Mr. Coyne's effort to recover a lost coat. Because the police had discharged the governmental duty in connection to the lost coat before detaining Mr. Coyne and Mr. Burt without an articulable suspicion to investigate further, we agree that the consent was vitiated by a prior illegal seizure, and affirm.

## FACTS

The facts are undisputed. Since the sole issue centers on

whether the facts support the trial court's conclusion, we set out the trial court's findings:

1. Deputy [Russell] Sieg testified that on September 25, 1997, at approximately 1405 hrs he was dispatched to a report of lost property. The deputy contacted a citizen who informed that he had found a coat outside his residence located at 411 S. Highland. The deputy testified the coat was found on the side of the roadway and that it was a nice coat that you would not expect somebody to throw away.

2. Deputy Sieg testified that the citizen had just left when he observed a vehicle drive by and then pull a U-turn and stop the vehicle at his location. The deputy testified that two white males contacted him. The passenger, defendant Burt, said that he had been jogging at about midnight on 09-23-27, when he dropped the coat on the side of the roadway because he was hot. Defendant Coyne then informed the deputy that the coat was actually his and that he had lent it to defendant Burt.

3. The deputy testified that he informed the defendants that he would have to identify the defendants before giving the coat back. Defendant Coyne produce[d] a drivers license. Defendant Burt did not have any identification; however, he gave the deputy his name and date of birth. The deputy did a driver's license check on both defendants. Defendant Coyne came back clear and defendant Burt had an outstanding warrant. The deputy testified that his main purpose for the drivers license check was to identify Burt by comparing the physical description that is given back to him from the license center. Deputy Sieg was aware that a warrant check is done at the same time.

4. The deputy testified that the defendants were in the vehicle when they initially contacted the deputy but that both had exited the vehicle when he asked for identification. The deputy stated the doors to the vehicle were shut; however, they were not locked.

5. The deputy stated that prior to the warrant being located that he planned on giving the coat back to defendant Coyne. The deputy also testified that he did feel [it] necessary to identify the parties involved when returning lost property. He also stated that in this particular case he thought the defendants story as to how they had lost the coat was suspicious.

6. After the warrant was discovered, Deputy Sieg called for backup and Deputy [James] White arrived. Deputy Sieg asked defendant Coyne if there was anything he should know about prior to searching the passenger compartment of the vehicle. The deputy testified that he planned on searching the vehicle incident to arrest. At that time, defendant Burt stated that there was some marijuana and a pipe in the front of the vehicle. Defendant Burt stated that these items were defendant Coyne's.

7. Both Deputy White and Deputy Sieg testified that Deputy White then asked defendant Coyne if he would mind if they looked into the trunk. Defendant Coyne stated that he did not mind and took his keys and opened the trunk for the deputies. Deputy White testified while looking in the trunk he found some baggies with what he believed to be marijuana residue in them, and approximately $8,500 in cash. At that time the deputy handcuffed the defendant and requested [the] presence of a supervisor. The vehicle was then impounded and the[n] a search warrant was requested and given for the vehicle.

8. Deputy White testified that he did not read the defendant his Miranda rights nor did he inform the defendant that he did not have to let him search the trunk. The deputy testified that he did not tell the defendant that he had to let them look into the trunk.

Deputy Sieg also testified that when Mr. Coyne and Mr. Burt got out of their car and identified themselves, they were acting nervous so Deputy Sieg asked them to step over and sit on the hood of his car. Deputy Sieg ran a warrant check while retaining Mr. Coyne's coat and license.

Procedurally, after the suppression hearing, the trial court concluded that once Deputy Sieg was satisfied that Mr. Coyne was the owner of the coat, and had produced proper identification, no justification existed to ask for Mr. Burt's identification or run a records check on him. Since Mr. Burt's seizure was illegal, his subsequent arrest and the search incident to arrest were also illegal. Finally, the court held Mr. Burt's illegal seizure and subsequent search of the vehicle vitiated Mr. Coyne's consent to search the

trunk. As a result, all of the evidence obtained by the deputies was suppressed and the case was dismissed.

## ANALYSIS

The issue is whether the trial court erred by suppressing evidence and concluding Mr. Burt was unlawfully seized prior to the discovery of his arrest warrant. The State contends that the contact between Deputy Sieg and Mr. Coyne and Mr. Burt was a consensual encounter and not a seizure. The trial court relied primarily upon the holdings of *State v. Rife*, 133 Wn.2d 140, 943 P.2d 266 (1997) and *State v. Soto-Garcia*, 68 Wn. App. 20, 841 P.2d 1271 (1992).

■■ The protections afforded by the Fourth Amendment do not come into play until a seizure has occurred. *State v. Thorn*, 129 Wn.2d 347, 350, 917 P.2d 108 (1996). The determination of whether a seizure has occurred is a mixed question of law and fact. *Id.* at 350-51. The trial court's resolutions of conflicting evidence surrounding the encounter are factual findings entitled to great deference. However, the ultimate determination of whether those facts constitute a seizure is one of law. *Id.* The facts are undisputed. Because they are unchallenged, the facts are verities for purposes of this review. *State v. Hill*, 123 Wn.2d 641, 644, 870 P.2d 313 (1994). We decide whether the court correctly concluded the facts gave rise to a seizure de novo. *State v. Thomas*, 91 Wn. App. 195, 200, 955 P.2d 420, *review denied*, 136 Wn.2d 1030 (1998). Mr. Burt and Mr. Coyne have the burden of proving that a seizure occurred. *Thorn*, 129 Wn.2d at 354.

■ A seizure occurs when, by means of physical force or a show of authority, a person's freedom of movement is restrained. *State v. Young*, 135 Wn.2d 498, 510, 957 P.2d 681 (1998). The court must look objectively at the totality of the circumstances to determine whether a reasonable person would have believed he was free to leave. *United States v. Mendenhall*, 446 U.S. 544, 554, 100 S. Ct. 1870, 64 L. Ed. 2d 497 (1980); *Young*, 135 Wn.2d at 510; *State v. Mennegar*, 114 Wn.2d 304, 310, 787 P.2d 1347 (1990).

When a citizen freely converses with a police officer, the encounter is permissive. It is not a seizure; and therefore the Fourth Amendment is not implicated. If a person does freely consent to stop and talk, the officer's merely asking questions or requesting identification does not necessarily elevate a consensual encounter into a seizure.

*State v. Barnes*, 96 Wn. App. 217, 222, 978 P.2d 1131 (1999) (citations omitted).

■ However, once an officer retains a suspect's identification or driver's license, and takes it with him to conduct a warrants check, a seizure within the meaning of the Fourth Amendment has occurred. *See Thomas*, 91 Wn. App. at 200-01; *State v. Dudas*, 52 Wn. App. 832, 834, 764 P.2d 1012 (1988); *State v. Aranguren*, 42 Wn. App. 452, 456-57, 711 P.2d 1096 (1985).

■ The officer's contact with Mr. Burt and Mr. Coyne was in response to a citizen's claim for the return of lost property. The legal duties of the police under these circumstances are described in RCW 63.21.060. A governmental entity acquiring lost property must first attempt to notify the apparent lawful owner or person lawfully possessing the property. *Id*. Next, the governmental entity simply establishes the validity of ownership or the right to possession so that the property may be returned. *Id*. The statute is not penal. Nor does the statute contemplate issuance of an infraction. It does not authorize any detention to perform a warrant check.

Here, the officer was satisfied with both Mr. Coyne's identity and ownership of the lost property before he and Mr. Burt were directed to sit on the hood of the patrol car while the officer investigated further. The record fails to show a reasonable articulated suspicion supporting the seizure. Mr. Coyne's license contained his address, photograph, and description. The officer was inclined to return the property to Mr. Coyne upon this showing. Nevertheless he seized both Mr. Coyne and Mr. Burt. Mr. Burt was a mere, identified bystander to the transaction between Mr.

Coyne and the officer. The lost property statute does not support a seizure for the purpose of running a warrant check under these circumstances. Under the facts, both Mr. Coyne and Mr. Burt would not have believed they were free to leave once they were ordered to sit on the hood of the patrol car and remain there while the officer investigated. The officer retained Mr. Coyne's coat and license during the investigation. Under these circumstances, the trial court properly concluded both Mr. Coyne and Mr. Burt were seized without legal authority. The trial court correctly concluded the later given consent was vitiated by the prior illegal detention. *Soto-Garcia*, 68 Wn. App. at 26-27.

Other cases have found permissive encounters ripening into seizures when an officer commands the defendant to wait, retains valuable property, or blocks the defendant from leaving. In *State v. Ellwood*, 52 Wn. App. 70, 757 P.2d 547 (1988), an officer approached the defendant who was walking in a high-crime area late at night. The court found that the defendant was seized after he verbally identified himself and the officer told him to "wait right here" while he ran a warrants check on the verbal identification. *Id.* at 73. In *Barnes*, 96 Wn. App. 217, the court found a seizure when the officer communicated a mistaken belief to the defendant that he had an outstanding warrant, and told him to "wait" while the warrant status was checked. In *State v. O'Day*, 91 Wn. App. 244, 955 P.2d 860 (1998), the court decided a passenger was seized when the officer ordered her out of the car, placed her purse out of reach, asked if she had drugs or weapons, and asked if she would consent to a search.

The State incorrectly argues no seizure took place because Deputy Sieg was justified under the community caretaking function in identifying the owner of the coat. The community caretaking function is an exception to the requirement of a warrant to stop or search. *State v. L.K.*, 95 Wn. App. 686, 691-92, 977 P.2d 39 (1999). In *State v. Markgraf*, 59 Wn. App. 509, 798 P.2d 1180 (1990), an officer responded to a report of a car parked for several hours

in a remote area with a female inside who may be in trouble. The court held that the officer's initial seizure of the defendant was justified under the community caretaking exception. But the officer's further detention and request for identification based upon the defendant's "dazed expression" was not justified. The court held, " 'A citizen's right to be free of governmental interference with his movement means, at a minimum, that when such interference must occur, it be brief and related directly in inquiries concerning the suspect.' " *Id.* at 513 (quoting *State v. Williams*, 102 Wn.2d 733, 741, 689 P.2d 1065 (1984)).

We emphasize again, the reason for the initial police contact had been discharged prior to ordering Mr. Coyne and Mr. Burt to sit on the hood of the police car. They were entitled to be free from further governmental interference with their movements at that point. Although the deputy thought their story was "suspicious," this suspicion, similar to a "dazed expression" is not enough to justify further intrusion. In other words, it did not amount to a reasonably articulated suspicion.

■ In sum, the trial court correctly decided Mr. Burt's unlawful seizure tainted Mr. Coyne's consent to search his trunk under *Soto-Garcia*. The *Soto-Garcia* court gave several nonexclusive factors for considering the legitimacy of a grant of consent: (1) temporal proximity of the illegality and the subsequent consent; (2) the presence of significant intervening circumstances; (3) the purpose and flagrancy of the official misconduct; and (4) the giving of *Miranda* warnings. *Soto-Garcia,* 68 Wn. App. at 27; *see Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694, 10 A.L.R.3D 974 (1966). Our review of this record supports the trial court's conclusion that the factors were soundly considered when deciding the illegal seizure vitiated Mr. Coyne's later given consent. Mr. Coyne was not advised of his *Miranda* rights. Furthermore, the unlawful seizure was intrusive because there was no other indication or suspicion of criminal activity. The officer asked Mr. Coyne's permission to search the trunk moments after arresting Mr. Burt and finding contraband in the front of the car.

Affirmed.

Kurtz, C.J., and Kato, J., concur.