[No. 24572-8-II. Division Two. March 16, 2001.]

THE STATE OF WASHINGTON, *Respondent*, v. SHAWN O. CRANE, *Appellant*.

302

*John L. Farra*, for appellant (appointed counsel for appeal).

*H. Steward Menefee*, *Prosecuting Attorney*, and *William A. Leraas*, *Deputy*, for respondent.

SEINFELD, J. — Shawn O. Crane appeals a conviction of possession of cocaine, claiming that the police discovered the drugs illegally. Because the officer who stopped Crane lacked a reasonable articulable suspicion of criminal conduct, the stop violated Crane's constitutional rights. Consequently, we reverse.

## FACTS

On February 28, 1999, Police Officer Green was in his parked patrol car monitoring a house in the city of Aberdeen. He had instructions to maintain the "status quo" while other officers obtained a warrant to search the residence for stolen property. Green's sergeant had specifically directed Green to identify anyone attempting to enter or leave the residence.

At about 4:30 A.M., Green observed a car pull into the residence's driveway. Robert Stopsen was driving and Crane and William Bryan were in the passenger seats. Green did not know any of the three men.

Green pulled his patrol vehicle into the driveway behind Stopsen's car as the three men started to approach the residence. After exiting his car, Green either asked or told the men to stop. They did so and walked toward Green. Crane testified that Green had motioned to them to approach him, and he used a "real demanding voice."

At that point, a woman came out of the house and asked Green what was happening. Green "explained to her that she was to stay inside and not come back out, and that [the police] weren't allowing people to come in and out of the residence, because [they] were in the process of obtaining a warrant[.]" Report of Proceedings at 7.

Green then asked Crane and the other two men where they were going. Crane replied that his half brother was in trouble and he was "going to get his stuff." Crane's half brother was Jarrod Airington, a resident of the house who had been arrested earlier in the evening.

In response to Green's request for identification, Crane provided his Quinault Tribal Identification, Stopsen provided some form of identification, and Bryan said that he did not have any identification with him but his name was James Bryan. According to his later testimony, Crane did not feel free to leave at this point. Green testified that he was "identifying everybody" because his sergeant had told

him to do so and that he had no specific reason to request identification from Crane.

While Green stood with the three men, holding Crane and Stopsen's identification cards, he used his handheld radio to call for a warrants check on Crane. The warrants check took only a couple of minutes and revealed a municipal court warrant for Crane. Green then arrested Crane.

Before being handcuffed, Crane removed his wallet from his back pocket and asked if he could give it to Bryan. Green said no and instructed Crane to place the wallet on the top of Stopsen's car. Crane complied.

Green started to search Crane when he noticed that Bryan had taken Crane's wallet off the car. Green ordered Bryan to put the wallet back on the car and Bryan complied. Green then noticed a small plastic baggie on the ground in front of Bryan and saw Bryan place his foot on top of the baggie. A field test indicated that the baggie contained cocaine.

After Green advised Crane of his rights, Crane gave a statement about the drugs. The State then charged him with possession of cocaine.

Crane argued at a hearing on his motion to suppress the cocaine that he was illegally seized when Green asked for identification and conducted a warrants search. The trial court denied the motion to suppress and, at a stipulated facts trial, found Crane guilty of possession of cocaine.

On appeal, Crane assigns error to several findings, but focuses his argument on finding III. He also challenges numerous conclusions of law. He contends that his contact with Officer Green, which led to the discovery of the cocaine, amounted to an illegal seizure in violation of both the Washington and United States constitutions.

## DISCUSSION

■■ When reviewing the denial of a suppression motion, we determine whether substantial evidence supports

the findings of fact and then determine whether the findings support the conclusions of law. *State v. Dempsey*, 88 Wn. App. 918, 921, 947 P.2d 265 (1997); *State v. Hill*, 123 Wn.2d 641, 644, 870 P.2d 313 (1994). Whether a seizure occurred is a mixed question of law and fact. We give the trial court's factual findings great deference but ultimately must decide as a question of law whether those facts constitute a seizure. Our review of this question is de novo. *State v. Thorn*, 129 Wn.2d 347, 351, 917 P.2d 108 (1996).

In his challenge to the findings, Crane basically claims that Green "told" him rather than "asked" him to stop, and "demanded" rather than "requested" identification. These challenges pertain to finding of fact III, which states:

> Officer Green observed a car turn into the driveway at the residence without signaling. The driver was identified as Robert O. Stopsen. The passengers were the defendant and William D. Bryan. The two passengers approached the house; [Officer] Green asked them to stop and they both turned and walked towards him. Green asked all three if he could see their ID. Stopsen and Crane both provided theirs. Bryan stated that he did not have any ID and he gave the name of James Bryan.

Clerk's Papers at 20.

Substantial evidence is evidence in the record of a sufficient quantity to persuade a fair-minded, rational person of the truth of the finding. *Hill*, 123 Wn.2d at 644 (citing *State v. Halstien*, 122 Wn.2d 109, 129, 857 P.2d 270 (1993)). It is the trial court's role to resolve issues of credibility, weigh evidence, and resolve differing accounts of the circumstances surrounding the encounter and the reviewing court gives deference to these determinations. *State v. Barnes*, 96 Wn. App. 217, 222, 978 P.2d 1131 (1999); *Russell v. Dep't of Human Rights*, 70 Wn. App. 408, 421, 854 P.2d 1087 (1993).

The record supports the trial court's finding that Green "requested" rather than "demanded" identification from Crane. Green testified several times that he "asked" Crane and the others if he could see some identification. Crane also testified that Green "asked" for identification. There is

no testimony indicating that Green demanded identification at any time.

The record is less clear about whether Green "asked" or "told" Crane to stop as he was approaching the house. Green testified at one point that he asked the men to stop. But later he testified that he believed he "told" them to stop: "I believe when they started walking to the house I told them to stop." Crane testified that Green said "stop" in a demanding tone of voice. But giving deference to the trial court and given the confusion in the record, we cannot say that the trial court erred in finding that Green "asked" Crane to stop.

We next consider Crane's challenge to conclusions of law II through XI. Conclusions of law II through VI accurately reflect current law, and conclusions of law IX and XI are not at issue here. The critical challenges are to conclusions of law VII, VIII, and X.

#### Conclusion of Law VII

The officer's brief questioning of the defendant, his request to see his ID and his brief retention of the ID for purposes of running a warrants check did not convert this contact into a seizure and was lawful.

#### Conclusion of Law VIII

Officer Green's contact with the defendant prior to his arrest did not amount to a seizure. Objectively, the defendant was free to leave. Following the discovery of the warrant for the defendant's arrest, he was lawfully arrested.

#### Conclusion of Law X

The controlled substances were validly seized.

Clerk's Papers at 24.

■ When the police execute a search warrant, they may stop and question persons approaching the place to be searched to determine their business at that location and to prevent them from interfering with the search. *State v. Melin*, 27 Wn. App. 589, 592, 618 P.2d 1324 (1980). But there is no authority allowing police to question persons approaching a scene where the police have not yet obtained

a warrant. Further, even where there is a warrant, such a limited stop "is not a license to detain and frisk all persons approaching within 100 feet of the location of [a] search in the absence of an articulable reason to believe the individuals have committed a crime." *Melin*, 27 Wn. App. at 592 (citing *Ybarra v. Illinois*, 444 U.S. 85, 100 S. Ct. 338, 62 L. Ed. 2d 238 (1979)). *See also State v. Lewis*, 19 Wn. App. 35, 573 P.2d 1347 (1978) (holding defendant's detention lawful where defendant resided at residence subject to a search warrant, was found outside working on a car that had been identified as connected to criminal activity, and was suspected of armed robbery).

The requirement that an officer have a reasonable, articulable suspicion before seizing a suspect helps achieve an overall balance between the needs of the police to conduct investigations and the constitutional protections of important liberties:

> There is an understandable desire by police officers to investigate what appear to be suspicious circumstances. Those investigations, however, must comport with Fourth Amendment protections. Otherwise, when a stop is not based on specifically articulated facts, "the risk of arbitrary and abusive police practices exceeds tolerable limits."

*State v. Thompson*, 93 Wn.2d 838, 843, 613 P.2d 525 (1980) (quoting *Brown v. Texas*, 443 U.S. 47, 52, 99 S. Ct. 2637, 61 L. Ed. 2d 357 (1979)).[1] Although in this case the search warrant had not yet been issued, we believe the same Fourth Amendment standards apply.[2]

 Crane argues that Officer Green seized him either when he (1) told Crane to stop as Crane approached the

---

[1] Regarding the dissent's footnote 6, although an individual has a reduced expectation of freedom from government intrusion once he or she is taken into custody under an outstanding arrest warrant, the mere fact that an individual happens to have an outstanding arrest warrant does not reduce the expectation of freedom from government intrusion before an officer even is aware of the outstanding warrant.

[2] Because we conclude under the Fourth Amendment analysis that Crane was seized before his arrest on the outstanding warrant, we have not examined Crane's assertion that the Washington Constitution offers greater protection in this instance.

residence; (2) asked Crane for identification; or (3) ran the warrants check. The State responds that there was no seizure until Green arrested Crane. Crane has the burden of establishing that a seizure occurred. *Thorn*, 129 Wn.2d at 354; *State v. Coyne*, 99 Wn. App. 566, 571, 995 P.2d 78 (2000).

■ ■ Not every encounter between an officer and an individual amounts to a seizure. A seizure does not occur when an officer simply approaches an individual in a public place and asks questions, requests identification, or makes other requests, as long as the individual need not answer and may simply walk away. *State v. Nettles*, 70 Wn. App. 706, 709-10, 855 P.2d 699 (1993); *State v. Richardson*, 64 Wn. App. 693, 696, 825 P.2d 754 (1992); *State v. Aranguren*, 42 Wn. App. 452, 456, 711 P.2d 1096 (1985); *State v. Belanger*, 36 Wn. App. 818, 820, 677 P.2d 781 (1984). Nor does a seizure automatically occur because an officer is in uniform or carrying a firearm. *Belanger*, 36 Wn. App. at 820.

■ In considering whether there was a seizure, we examine the circumstances surrounding the contact between the individual and the officer to determine whether a reasonable person would have felt free to leave or terminate the contact. *Florida v. Royer*, 460 U.S. 491, 497, 103 S. Ct. 1319, 75 L. Ed. 2d 229 (1983); *State v. Young*, 135 Wn.2d 498, 510, 957 P.2d 681 (1998); *Nettles*, 70 Wn. App. at 709-10; *Richardson*, 64 Wn. App. at 696; *Aranguren*, 42 Wn. App. at 455-56 (citing *Belanger*, 36 Wn. App. 818). Whether a reasonable person would feel free to walk away is an objective determination. *Barnes*, 96 Wn. App. at 222-23 (citing *State v. Ellwood*, 52 Wn. App. 70, 73, 757 P.2d 547 (1988)).

An officer's actions may constitute a progressive intrusion into the individual's privacy that amounts to a seizure under the Fourth Amendment. *Royer*, 460 U.S. at 503; *Aranguren*, 42 Wn. App. at 456. Even where an initial contact does not amount to a seizure, it may "mature" or "transform" into a seizure if the officer's actions ultimately

create a situation where the individual no longer feels free to leave. *Royer*, 460 U.S. at 503; *Richardson*, 64 Wn. App. at 696-97; *Aranguren*, 42 Wn. App. at 456-57.

■ When Officer Green initiated the contact by pulling in behind Stopsen's car and asking Crane to stop as Crane approached the residence, this limited stop was not yet a seizure. From Green's conversation with the woman who came outside, Crane probably was aware that Green was monitoring the house and was not allowing anyone to enter. But when Green requested identification from Crane and called in the warrants check over his portable radio within Crane's hearing, the situation changed.[3]

It is well established that if an officer retains the suspect's identification while conducting a warrants check away from the suspect, there has been a seizure within the meaning of the Fourth Amendment. *Coyne*, 99 Wn. App. at 572 (citing *State v. Thomas*, 91 Wn. App. 195, 200-01, 955 P.2d 420 (1998); *State v. Dudas*, 52 Wn. App. 832, 834, 764 P.2d 1012 (1988); *Aranguren*, 42 Wn. App. at 456-57). Courts have also found a seizure where the officer told the suspect to wait or stay in a specific place while the officer ran a warrants check. *See Coyne*, 99 Wn. App. at 573 (finding that the defendant had been seized when the officer told the defendant to sit on the hood of the patrol car and remain there while the officer ran a warrants check); *Barnes*, 96 Wn. App. at 223-24 (finding the defendant had been seized when the officer told the defendant he believed there was an outstanding warrant for the defendant and told the defendant to wait while he checked on the warrant status); *Ellwood*, 52 Wn. App. 70 (finding that the defendant had been seized when the officer told the defendant to wait while the officer ran a warrants check). But merely examining and not retaining a suspect's identification is not a seizure. *State v. Hansen*, 99 Wn. App. 575, 576, 994 P.2d

---

[3] As the dissent notes in its footnote 7, Officer Green had authority under RCW 46.61.021(2) to run a warrants check on any person he stopped for a traffic infraction. But Crane, a passenger, did not commit a traffic infraction and Officer Green never asserted that he was investigating a traffic infraction at the time he requested Crane's identification.

855, *review denied*, 141 Wn.2d 1022 (2000) (holding that a seizure did not result when the officer handed the identification to a second officer who recorded the suspect's name and birth date and returned the license to the suspect before conducting a warrants check).

This case falls between the situation above where the officer walks away with the identification and runs a warrants check and the situation in *Hansen*, where the officer merely records information from the identification and returns it. We see no relevant distinction between this case and the former. In fact, a detainee might well feel more intimidated and less free to leave when the officer is close at hand.

Here, although Green did not specifically tell Crane that he was not free to leave or that he must wait during the warrants check, the circumstances would cause a reasonable person to conclude that he was not free to leave or to terminate contact until the officer completed the warrants check and found the detainee had a clear record. This was not a casual contact on a public street. Green had parked his patrol car behind the car Crane arrived in, requested Crane's identification, and retained it while running a warrants check. Crane was also aware he had entered an area the police had secured. Thus, we conclude that Green seized Crane at the latest when Green held Crane's identification and ran the warrants check.

Crane next argues that there was no justification to seize him at that time. He contends that his entering an area that the police had under surveillance while they awaited a search warrant did not justify the seizure. The State responds that these facts justified the seizure because Green had a duty to maintain the status quo until the search warrant was issued.

██ ██ "All seizures of the person, even those involving only brief detentions, must be tested against the Fourth Amendment guaranty of freedom from unreasonable searches and seizures." *Thompson*, 93 Wn.2d at 840. *See also Royer*, 460 U.S. at 498; *Richardson*, 64 Wn. App. at 697. An investigatory stop may be made on less than

probable cause. *Thompson*, 93 Wn.2d at 840. "An officer making such an investigatory stop, however, is required by the Fourth Amendment to have a reasonable suspicion, based on objective facts, that the individual is involved in criminal conduct" or is a safety threat. *Thompson*, 93 Wn.2d at 840-41. *See also State v. Madrigal*, 65 Wn. App. 279, 827 P.2d 1105 (1992); *State v. Howard*, 7 Wn. App. 668, 673, 502 P.2d 1043 (1972). The State has the burden to show that the particular warrantless seizure is valid. *State v. Williams*, 102 Wn.2d 733, 736, 689 P.2d 1065 (1984) (citing *State v. Houser*, 95 Wn.2d 143, 149, 622 P.2d 1218 (1980)).

▮ Neither close proximity to others suspected of criminal activities nor presence in a high crime area, without more, will justify a seizure. *See Ybarra*, 444 U.S. at 90-91 (holding that although a warrant gave the police authority to search a tavern and the bartender for narcotics, it did not give them the authority to search a patron without a reasonable belief that the patron either was involved in criminal activity or was armed or dangerous); *Thompson*, 93 Wn.2d at 841-42 (finding a violation of the Fourth Amendment when there were no indications that the officers suspected the defendant of any specific misconduct and no evidence pointed to other circumstances that would raise a reasonable suspicion of criminal conduct); *Richardson*, 64 Wn. App. at 697; *Ellwood*, 52 Wn. App. at 74; *Dudas*, 52 Wn. App. at 835.

▮ Here, Crane complied with all of Green's requests. He stopped when told to, produced identification when requested, and offered what appeared to be a legitimate reason for approaching the house. The State does not propose any reason to suspect that Crane was not being truthful, that Crane's identification card was false, that Crane posed or appeared to pose any threat to Green, or that Crane behaved suspiciously in any way until after he was arrested. Green was checking identification solely because he was told to do so by his sergeant, not because Crane had behaved suspiciously or posed any type of threat. Green could have secured the residence simply by telling Crane to leave.

██ Because Green had no reasonable articulable suspicion that Crane had committed or was about to commit a crime or that Crane was a threat to anyone's safety, the seizure violated Crane's Fourth Amendment rights. Further, we disagree with the dissent's reliance on the inevitable discovery rule. The State has the burden of proving inevitable discovery by a preponderance of the evidence but, here, it failed to argue inevitable discovery below or on appeal. *State v. Reyes*, 98 Wn. App. 923, 926, 993 P.2d 921 (2000). Thus, it is improper for us to rely on this doctrine.

Nor are we persuaded by the dissent's policy argument regarding the authority of police to ask a visitor to leave after the issuance of a search warrant. The dissent contends the same rule should apply during the pendency of a search warrant. Although we do not disagree with this proposition, we see an important distinction between asking a person to leave the scene and seizing a person who comes to the scene during the pendency of a search warrant.

██ It was error to deny Crane's motion to suppress the drug evidence. And as the subsequent discovery of the drugs was a result of this illegal seizure and the drug evidence was the sole basis of Crane's conviction, we reverse the conviction. *See Wong Sun v. United States*, 371 U.S. 471, 487-88, 83 S. Ct. 407, 9 L. Ed. 2d 441 (1963).

ARMSTRONG, C.J., concurs.

HUNT, J. (dissenting) — I respectfully dissent. First, at oral argument, Crane acknowledged that if the officers had *already* obtained the search warrant when he approached, they would have been justified in asking him to leave. For purposes of assessing the reasonableness of the officer's actions and Crane's expectation of privacy, there should be no qualitative difference between a search warrant being obtained and a search warrant having already been issued. *See* the United States Supreme Court's recent decision in

*Illinois v. McArthur*, 531 U.S. 326, 121 S. Ct. 946, 148 L. Ed. 2d 838 (2001) (finding no Fourth Amendment violation where officers securing a house while awaiting issuance of a search warrant prevented a resident from entering unaccompanied for two hours—a relatively minor intrusion on personal privacy when balanced against reasonable law enforcement concerns).[4]

Second, as the majority acknowledges, it is not illegal for police to talk to a person in public, so long as the person is free to leave. (Majority at 309.) Here, Officer Green was securing a residence while other officers were obtaining a search warrant. A vehicle pulled into the driveway at 4:30 A.M. without signaling; three men exited and approached the house. Green told them to stop, a woman came out of the house, Green told her to go back in because police were getting a warrant, and Green asked the three men where they were going. Crane responded that his half brother had gotten into trouble (he had been arrested earlier) and that he was "going to get his stuff."

Green then asked to see some identification, which the driver and Crane both produced. For one or two minutes Green stood with the men while he used his handheld radio to check their records. Green discovered that there

---

[4] The Supreme Court reasons:

[R]ather than employing a *per se* rule of unreasonableness, we balance the privacy-related and law enforcement-related concerns to determine if the intrusion here was reasonable. Cf. *Delaware v. Prouse*, 440 U.S. 648, 654 [, 99 S. Ct. 1391, 59 L. Ed. 2d 660] (1979) . . . .

. . . [I]n light of the following circumstances, which we consider in combination. First, the police had probable cause to believe that McArthur's trailer home contained evidence of a crime and . . . unlawful drugs. . . .

Second, the police had good reason to fear that, unless restrained, McArthur would destroy the drugs before they could return with a warrant. . . .

Third, the police made reasonable efforts to reconcile their law enforcement needs with the demands of personal privacy. . . . , preventing McArthur only from entering the trailer unaccompanied.

Fourth, the police imposed the restraint for a limited period . . . . which . . . . was no longer than reasonably necessary for the police, acting with diligence, to obtain the warrant.

*Illinois v. McArthur*, 531 U.S. at 331-32.

was an outstanding warrant for Crane's arrest and handcuffed him.[5]

"Not every encounter between an officer and an individual amounts to a seizure." *State v. Armenta*, 134 Wn.2d 1, 10, 948 P.2d 1280 (1997) (quoting *State v. Aranguren*, 42 Wn. App. 452, 455, 711 P.2d 1096 (1985)). A police officer has not seized an individual merely by approaching him in a public place and asking him questions, as long as the individual need not answer and may simply walk away. *State v. Thomas*, 91 Wn. App. 195, 200, 955 P.2d 420, *review denied*, 136 Wn.2d 1030, 972 P.2d 467 (1998) (citations omitted). Moreover, police questioning relating to one's identity, or a request for identification by the police, without more, is unlikely to result in a seizure. *Armenta*, 134 Wn.2d at 11.

*State v. Hansen*, 99 Wn. App. 575, 578, 994 P.2d 855, *review denied*, 141 Wn.2d 1022 (2000).

The intrusion into Crane's privacy[6] was minimal and justified under the circumstances: (1) maintaining the status quo during procurement of a search warrant; (2) the unexpected arrival at 4:30 A.M. of three men, one of whom had just committed a traffic violation in the officer's presence; (3) Crane's stated intent to go into the house (which the police had probable cause to believe contained stolen property) to get his (or his brother's) "stuff"; and (4) the brevity of the contact, while Officer Green talked to the men and radioed the warrant checks. *See Illinois v. McArthur*, 531 U.S. 326.

In *State v. Rife*, 133 Wn.2d 140, 943 P.2d 266 (1997), the Supreme Court held unreasonable a 30-minute detention of a jaywalker while the officer ran a warrant check. But it was not the warrant check that the Court decried; rather, it

---

[5] The officer did not detain and frisk all persons approaching the location of a search as was rejected in *State v. Melin*, 27 Wn. App. 589, 592, 618 P.2d 1324 (1980), cited by the majority at page 307.

[6] Arguably, a person with an outstanding arrest warrant should have a reduced expectation of freedom from government intrusion just as a sex offender has a reduced expectation of privacy. *See, e.g., State v. Ward*, 123 Wn.2d 488, 502, 869 P.2d 1062 (1994): "Persons found to have committed a sex offense have a reduced expectation of privacy because of the public's interest in public safety and in the effective operation of government."

was the grossly disproportionate duration of the detention.[7]
Here, Crane had been a passenger in the car that had
committed the traffic violation, he had exited the car with
the driver and another man, and all three were approach-
ing the house containing stolen property in the early hours
of the morning. Rather than singling out the driver, whom
the officer was justified in stopping for failure to signal, the
officer asked all three collectively for identification. The
encounter here took only a minute or two, in stark contrast
to the half-hour detention in *Rife. Accord Hansen*, 99 Wn.
App. 575.

In *Hansen*, Division One held that a 30-second encounter
while the officer took identification, copied down informa-
tion, handed back identification, then ran warrant check
and discovered outstanding warrant in the defendant's
presence, did not constitute an improper seizure of the
defendant in violation of the Fourth Amendment, and did
not require suppression of the drugs.

> In *Thomas*, the court held that a seizure occurred when an
> officer, while retaining the defendant's identification, took
> three steps back to conduct a warrants check on his hand-held
> radio. *Thomas*, 91 Wn. App. at 200-01. Similarly, in *State v.
> Dudas*, 52 Wn. App. 832, 834, 764 P.2d 1012 (1988), the court
> determined that the defendant was seized under the Fourth
> Amendment when the deputy took his ID card and returned to
> the patrol car, thus immobilizing him. In *Aranguren*, the court
> found that a seizure occurred when an officer took the defen-
> dants' identification documents to his vehicle to write their
> names down and run warrants checks on them. *Aranguren*, 42
> Wn. App. at 456. Finally, in *Armenta*, our Supreme Court
> concluded that the defendant was seized when a police officer
> placed the defendant's money in his patrol car "for safe keep-
> ing." *Armenta*, 134 Wn.2d at 6, 12. In each of these cases, the
> officer removed defendant's identification or property from
> defendant's presence.

---

[7] In 1997, the Legislature, in special session, amended RCW 46.61.021 (the
statute questioned in *Rife*) to provide specifically that a police officer may "check
for outstanding warrants" whenever a person is stopped for a traffic infraction.
LAWS OF 1997, 1st Spec. Sess., ch.1.

Here, officers Teachworth and Brooks never removed Hansen's license from his presence. The officers held it for no more than 30 seconds while Brooks took note of Hansen's name and birth date. They did not retain Hansen's license for a lengthy period or while they conducted the warrants check. Had Teachworth alone viewed Hansen's license and returned it to him, the encounter would have maintained its consensual nature. There is no reason handing the license to another officer standing beside the first would have led a reasonable person to believe that he was not free to leave. The initial consensual encounter thus did not ripen into an unlawful detention.

*Hansen*, 99 Wn. App. at 578-79. Similarly, that Officer Green held Crane's identification for 60 to 120 seconds did not transform the consensual encounter into a seizure, even if Crane may not have felt free to leave for that minute or two until he received back his identification.[8]

Third, even if Crane was illegally seized and should have been free to go immediately, the inevitable discovery rule would defeat suppression of the evidence. Because the officer's encounter with Crane was so brief, even if Crane had simply walked away after providing his name and identification, the officer would likely have discovered the existence of the warrant shortly thereafter and still had time to apprehend and to arrest Crane. *See Ornelas v. United States*, 517 U.S. 690, 694, 116 S. Ct. 1657, 134 L. Ed. 2d 911 (1996); *Nix v. Williams*, 467 U.S. 431, 104 S. Ct. 2501, 81 L. Ed. 2d 377 (1984).

I would uphold the trial court's Conclusions of Law VII, VIII, and X that: the officer's conduct did not constitute a seizure in violation of the Fourth Amendment; the contact was lawful; and the controlled substances were validly seized following Crane's arrest on the outstanding warrant. I would affirm.

---

[8] Also, because of the brevity of the encounter, it is of little significance that Green handed Crane's identification back to him right after the warrant check rather than just before, as in *Hansen*.