IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 35560-8-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| OTONIEL CARRIERO, | ) | PUBLISHED OPINION |
| | ) | |
| Appellant. | ) | |

FEARING, J. —

> *So what do we do if we don't know [whether a seizure occurred]? I can follow my instinct. My instinct is he would feel he wasn't free because the red light's flashing. That's just one person's instinct. Or I could say, let's look for some studies. They could have asked people about this, and there are none . . . . What should I do? Look for more studies?*
> —Justice Stephen Breyer
> *Maybe we can just pass until the studies are done?*
> —Justice Antonin Scalia
> Transcript of Oral Argument at 43, *Brendlin v. California*, 551 U.S. 249, 127 S. Ct. 2400, 168 L. Ed. 2d 132 (2007) (No. 06-8120).

We address familiar questions in a unique setting for Washington law. First, did

law enforcement seize a citizen within the meaning of the Fourth Amendment to the

No. 35560-8-III
*State v. Carriero*

United States Constitution or WASH. CONST. art. I, § 7? Second, did reasonable suspicion for a *Terry* stop support any seizure? We hold that law enforcement officers seized appellant Otoniel Carriero when two patrol cars blocked the only exit of Carriero's Monte Carlo from a dead end alley and two officers respectively approached the passenger and driver side windows. Since the police officers lacked any suspicion of criminal activity, the seizure was unlawful. Because of the violation of Carriero's constitutional rights, we reverse his conviction for unlawful possession of a firearm.

FACTS

We borrow our narrative from the findings of fact entered by the trial court after a CrR 3.6 suppression hearing. We add some of the underlying testimony of law enforcement officers during the hearing.

At 2:00 a.m. on a summer morning, the Yakima Police Department received a phone call from a resident who lived adjacent to the alleyway between the 1500 block of Roosevelt Avenue and Cherry Avenue. The State presented no testimony that the caller identified himself or herself. The reporting party called 911 to report a suspicious vehicle, with lights off, parked at the dead end of the alley. The caller did not recognize the car. Law enforcement knows the neighborhood as plagued with burglaries, vehicle prowling, and gang violence.

Yakima Police Officers Garrett Walk and Scott Gronewald, in their respective marked patrol cars, responded to the call. Officer Walk drove down the dim, block-long,

2

narrow alleyway, followed by Officer Gronewald. Neither officer activated his car's

emergency lights or sirens, but each car's headlights illuminated the Monte Carlo.

Officer Gronewald activated his directional rear lights, which flash yellow to oncoming

traffic. At the end of the alleyway, the officers saw a red Chevrolet Monte Carlo facing

their direction, occupied by two individuals, later identified as Otoniel Carriero and

Amber Rodriguez. According to Officer Gronewald, the two officers endangered

themselves by driving down the narrow alley facing Carriero's vehicle, but the two

lacked a safe way to approach the Monte Carlo. The unlit Monte Carlo had its engine

off.

Officer Garrett Walk stopped his patrol vehicle one car length away from Otoniel

Carriero's Monte Carlo, and Officer Scott Gronewald parked his car behind Officer

Walk's car. By stopping their patrol vehicles in the narrow alley, the officers' patrol cars

blocked Carriero's egress. Officer Walk testified at the suppression hearing:

> Q. And the alleyway, is it a narrow or wide alleyway?
> A. It's not the widest one I've been in, but there is space to actually get two cars down the alleyway.

Report of Proceedings (RP) at 13-14. Officer Scott Gronewald testified:

> Every situation is different, I guess, but in this case it's a pretty narrow alley.
> I believe when Officer Walk ended up having to turn around, he had to do a five or six-point turn. I think I had to move my side mirror in so he could fit by me. So it's a very narrow alley. I believe, to memory, Officer Walk parked more on the north side of the alley as what I did. . . .

RP at 38-39.

Officer Garrett Walk further testified at the suppression hearing:

Q. (By Mr. Hintze) When you first made contact with the defendant and his vehicle and the passenger, were there any concerns that a crime might be being committed?
A. There is always a potential. I never know for sure until we actually talk and have done an investigation.

RP at 24.

Officers Garrett Walk and Scott Gronewald exited their respective vehicles with flashlights in hand and approached the stationary Monte Carlo. The officers noticed Otoniel Carriero seated in the driver's seat and Amber Rodriguez seated in the front passenger seat. Neither officer observed any suspicious behavior or furtive movements from either occupant. Officer Gronewald ambled to the driver's side door and positioned himself adjacent to the door. Officer Walk walked to the passenger side door.

Officer Garrett Walk greeted the pair with "[h]i guys" and spoke with a casual and friendly tone of voice. Clerk's Papers (CP) at 38. Officer Walk questioned whether either lived in the neighborhood, and Carriero responded that neither did. Carriero told the officers that the two wanted to be alone together. Carriero added that he owned the Monte Carlo.

Officer Garrett Walk explained that a concerned neighbor called 911 and reported an unfamiliar car in the alley. Walk asked Otoniel Carriero and Amber Rodriguez if either possessed identification. Neither Officer Scott Gronewald nor Officer Walk told

4

the two that they were free to leave. Rodriguez handed Walk her identification card, while Carriero handed Gronewald his card. During cross-examination at the suppression hearing, Gronewald declared:

> Q. (By Ms. Holman) Is it possible, had he [Carriero] grabbed the license out of your hands and took off, that you would have eventually charged him, you personally, with assault or obstruction?
> A. It is possible, yes.

RP at 43.

Officer Scott Gronewald read Otoniel Carriero's name and date of birth to dispatch over his radio while standing by the vehicle. In turn, dispatch informed Gronewald that Carriero was a convicted felon, who bore a conviction for unlawful possession of a firearm, but had no outstanding warrants. Officer Gronewald returned the identification card to Carriero.

Officer Garrett Walk read Amber Rodriguez's information to dispatch and restored her identification card to her. Dispatch informed Officer Walk of outstanding arrest warrants for Rodriguez. At Officer Walk's order, Rodriguez exited the Monte Carlo. Walk placed Rodriguez in handcuffs and sat her near the rear of the car.

Officer Scott Gronewald remained standing on the driver's side of the car and shined his flashlight into Otoniel Carriero's vehicle. Gronewald espied a silver and black handgun in a pouch behind the driver's seat. Gronewald told Carriero to keep his hands on the steering wheel. Both officers directed Carriero to exit the vehicle, and the pair

placed Carriero in custody. Law enforcement later procured a search warrant for the

Monte Carlo and retrieved a loaded semiautomatic pistol from the seat pouch.

PROCEDURE

The State of Washington charged Otoniel Carriero with first degree unlawful

possession of a firearm. Carriero moved to suppress all evidence and his statements

based on an unlawful seizure. The trial court conducted a CrR 3.6 hearing, during which

the court viewed a video of the interaction between Otoniel Carriero and Officers Garrett

Walker and Scott Gronewald. Officers Walk and Gronewald testified.

Following the suppression hearing, the trial court entered twenty-seven findings of

fact, all consistent with the hearing testimony except a finding that the officers knew the

identity of the caller. We repeat the critical findings:

> 3. The caller's identity was known to police. The caller reported to
> dispatch that there was a darkened occupied vehicle parked at the end of the
> dead-end alley, that the vehicle was not associated with any of his
> neighbors, and that he was very concerned that criminal activity or violence
> would be committed.
> . . . .
> 9. Officer Walk stopped his vehicle about one car length away from
> the Defendant's vehicle. Officer Gronewald stopped his vehicle right
> behind officer Walk's.
> 10. Due to the narrowness of the alley, two vehicles could not have
> driven past each other where the officers stopped their vehicles.
> . . . .
> 12. Although their headlights illuminated the scene in front of their
> patrol vehicles, the officers never activated their emergency lights or sirens.
> 13. The two officers exited their vehicles with flashlights in their
> hands and approached the Defendant's parked vehicle. The Defendant was

seated in the driver's seat and a female passenger was seated in the front passenger seat.

14. The COBAN video of the encounter from the beginning to end did not show any indication of the two occupants ever readjusting their clothing.

15. Officer Gronewald walked around the rear of the vehicle and up to the driver's side door.

16. Officer Walk went up to the passenger side door and began speaking to the Defendant and the passenger.

. . . .

25. After spotting what appeared to be a firearm, Officer Gronewald told the Defendant to keep his hands on the vehicle's steering wheel. The Defendant had never been ordered to do anything or been told that he was detained prior to this point.

. . . .

CP at 37-40.

The trial court concluded, founded on the totality of the circumstances, that the Yakima Police Department officers based their conduct on a reasonable articulable suspicion of criminal activity. The trial court upheld the seizure of the pistol confiscated from the Monte Carlo pouch.

The prosecution proceeded to trial. The jury convicted Otoniel Carriero as charged. The trial court sentenced Carriero to a standard range sentence of 36 months' confinement.

## LAW AND ANALYSIS

### Facts on Appeal

Before addressing the merits of Otoniel Carriero's appeal, we must discern the facts on which we base our decision. The parties dispute some of the facts on appeal.

The trial court entered findings of fact and conclusions of law based on the evidence presented at the suppression hearing. This court reviews a trial court's findings of fact for substantial evidence. *State v. Gatewood*, 163 Wn.2d 534, 539, 182 P.3d 426 (2008). Unchallenged findings of fact entered following a suppression hearing are verities on appeal. *State v. Gaines*, 154 Wn.2d 711, 716, 116 P.3d 993 (2005).

Otoniel Carriero only assigns error to finding of fact number 3 to the extent that the finding reads that "[t]he caller's identity was known to police." CP at 37. We agree with Carriero that the evidence at the suppression hearing does not support the finding of fact. Neither officer testified to knowing the caller's identity.

The State contends that we should not address Otoniel Carriero's assignment of error to finding of fact 3, because Carriero presented no argument in his brief as to invalidity of the finding of fact. RAP 10.3(a)(6) directs each party to supply, in his brief, "argument in support of the issues presented for review, together with citations to legal authority and references to relevant parts of the record." We agree with the State that Carriero failed to sufficiently discuss the assignment of error. We could waive the violation of RAP 10.3(a)(6) to serve the ends of justice, particularly since the State shows no prejudice. RAP 1.2(c). We elect not to waive the violation since our analysis regarding reasonable suspicion would not change depending on whether the 911 caller identified himself or herself.

In its brief, the State writes that the Yakima Police Department patrol cars did not block Otoniel Carriero's car from exiting the alleyway. The State cites pages 13 through 15 of the suppression hearing report of proceedings for this factual assertion. Those pages do not support the State's contention. On those pages, Officer Garrett Walk testified that the alley holds space for two cars, presumably two cars abreast of one another. Nevertheless, he never testified that the location of his car did not block Carriero's escape. Officer Walk could have parked his car in the middle of the alley in order to prevent an exit. The State also fails to recognize that Officer Scott Gronewald parked his vehicle behind Walk's patrol car and further to the south of Walk's vehicle. Since Officer Gronewald's car straddled the width of where Walk parked his car, the totality of the two cars blocked Carriero's exit. During the suppression hearing, Officer Walk testified to retracting his side mirror in order for Gronewald to exit the alleyway, and Walk described the machinations needed in order for Gronewald to turn his car around.

In finding of fact ten, the trial court found that two vehicles could not have driven past each other in the narrow alley. The State assigns no error to this finding of fact. We review the case based on the fact that the officers' patrol cars blocked Otoniel Carriero's Monte Carlo from departing the alley.

The State suggests that Officer Scott Gronewald requested identification from Otoniel Carriero after Officer Garrett Walk confirmed that the passenger had outstanding

9

warrants. Br. of Resp't at 4. We disagree. Garrett Walk asked both occupants for their identification at the same time.

The State also suggests the contact was not "officer initiated." Br. of Resp't at 11. Perhaps the State wishes to suggest that a caller precipitated the contact. Regardless, the officers initiated the contact between them and Otoniel Carriero, rather than vice versa.

Seizure

We move to the merits of Otoniel Carriero's appeal. Carriero assigns error to the trial court's refusal to grant his motion to suppress evidence of the Walther .380 pistol found in his Monte Carlo on the morning of July 28, 2015. The appeal raises two discrete questions: (1) whether law enforcement officers seized Carriero, and (2) whether the officers held reasonable suspicion to seize Carriero. The parties fuse the two issues. If we answer the first question in the negative, we need not address the second question, since Yakima Police Department officers needed reasonable suspicion only if they seized Carriero. We hold that the Yakima officers seized Carriero.

Otoniel Carriero relies on both the Fourth Amendment to the United States Constitution and WASH. CONST. art. I, § 7. The Fourth Amendment declares: "[t]he right of the people to be secure in their persons, houses, papers, and effects, against *unreasonable searches and seizures*, shall not be violated." (Emphasis added.) Article I, § 7 of the Washington Constitution declares: "No person shall be disturbed in his private affairs, or his home invaded, without authority of law."

The Washington Constitution does not employ the word "seizure." Still, whether a law enforcement officer "seizes" a citizen holds relevance when assessing a violation of article I, § 7. *State v. Harrington*, 167 Wn.2d 656, 663, 222 P.3d 92 (2009). A law enforcement officer needs no cause to question a citizen unless the officer seizes the citizen.

The Washington Supreme Court, in *State v. Young*, 135 Wn.2d 498, 957 P.2d 681 (1998), rejected the United States Supreme Court's ruling in *California v. Hodari D.*, 499 U.S. 621, 111 S. Ct. 1547, 113 L. Ed. 2d 690 (1991), that a seizure does not occur if the defendant does not yield to the authority of the officer. Otherwise, Washington follows the same principles announced by the United States Supreme Court under the Fourth Amendment for determining a seizure. Therefore, we review both federal and state seizure decisions. The accused carries the burden to establish that law enforcement seized him. *State v. Young*, 135 Wn.2d at 510.

Whether police "seized" a person is a mixed question of law and fact. *State v. Armenta*, 134 Wn.2d 1, 9, 948 P.2d 1280 (1997). The resolution by a trial court, of differing accounts of the circumstances surrounding the encounter, are factual findings entitled to great deference. *State v. Harrington*, 167 Wn.2d at 662 (2009). The trial court's role includes resolving issues of credibility and to weigh evidence. *State v. Crane*, 105 Wn. App. 301, 306, 19 P.3d 1100 (2001), *overruled on other grounds by State v. O'Neill*, 148 Wn.2d 564, 62 P.3d 489 (2003). But the ultimate determination of

whether those facts constitute a seizure presents a question of law that this court reviews

de novo. *State v. Harrington*, 167 Wn.2d at 662; *State v. Beito*, 147 Wn. App. 504, 508-

09, 195 P.3d 1023 (2008). We take these principles of review to mean we accept the trial

court's findings of the bare facts uninfected by any inferences and unencumbered by

legal significance. We accept the trial court's findings as to the actions taken by the

officers or not taken by the officers.

Not all personal intercourse between policemen and citizens involves "seizures" of

persons. *United States v. Mendenhall*, 446 U.S. 544, 552, 100 S. Ct. 1870, 64 L. Ed. 2d

497 (1980); *Terry v. Ohio*, 392 U.S. 1, 19 n.16, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968).

In *United States v. Mendenhall*, 446 U.S. 544, the United States Supreme Court

established a test for what constitutes a seizure, a test that courts, including Washington

courts, employ today. A seizure occurs when, "in view of all of the circumstances

surrounding the incident, a reasonable person would have believed that he was not free to

leave." *United States v. Mendenhall*, 446 U.S. at 545. Stated more elaborately, police

contact constitutes a seizure only if, due to an officer's use of physical force or display of

authority, a reasonable person would not feel free to leave, terminate the encounter,

refuse to answer the officer's question, decline a request, or otherwise go about his

business. *State v. Thorn*, 129 Wn.2d 347, 353, 917 P.2d 108 (1996), *overruled on other

grounds by State v. O'Neill*, 148 Wn.2d 564 (2003); *State v. Beito*, 147 Wn. App. at 508

(2008). A person may be seized by a show of authority as well as by physical force.

12

*United States v. Mendenhall*, 446 U.S. at 553. We emphasize that the officer seizes the citizen not only when the citizen feels compelled to remain still but also when the citizen deems himself obliged to respond to the officer's requests.

The subjective intent of the police to execute a seizure lacks relevance, unless conveyed to the defendant. *United States v. Mendenhall*, 446 U.S. at 554 n.6. Instead, we consider the officer's actual conduct and whether the conduct appears coercive. *State v. Thorn*, 129 Wn.2d at 353 (1996). Thus, the dissent's framing the issue of whether the officers purposely blocked Otoniel Carriero lacks relevance. Whether a reasonable person would believe he was detained depends on the particular, objective facts surrounding the encounter. *State v. Ellwood*, 52 Wn. App. 70, 73, 757 P.2d 547 (1988). The United States Supreme Court has rejected any per se rules and denied that any one discrete act by officers necessarily constitutes a seizure. *Florida v. Bostick*, 501 U.S. 429, 439, 111 S. Ct. 2382, 115 L. Ed. 2d 389 (1991). Instead, a court must consider the totality of circumstances surrounding the encounter. *Florida v. Bostick*, 501 U.S. at 439.

The United States Supreme Court's holding in *United States v. Mendenhall* instructs lower courts to employ a reasonable person test when assessing whether the citizen would deem himself or herself free to leave from an encounter with a law enforcement officer or deem himself or herself at liberty to deny an officer's request and go about his or her business. Nevertheless, the high Court omitted any direction as what steps courts should take when divining the beliefs, thoughts, fears, or conclusions of the

hypothetical reasonable person as to whether he or she has been seized when contacted by a law enforcement officer. Courts never entertain expert psychological evidence or sociological studies on the question of whether a reasonable person would consider himself or herself free to leave or decline cooperation under discrete circumstances. If the defendant testifies that he or she did not deem himself or herself free to exit or free to ignore the officer's requests, the court ignores such testimony. *State v. Mote*, 129 Wn. App. 276, 292-93, 120 P.3d 596 (2005).

The State characterizes the Yakima police officers' encounter with Otoniel Carriero, at least until Officer Scott Gronewald glimpsed the pistol, as social contact. The State does not argue that no seizure occurred because Carriero had intended to stay inside his Monte Carlo in the alleyway regardless of police action.

Washington courts, with help from other courts, distinguish between social contact between the officer and citizen and a seizure. Washington courts have not defined "social contact." *State v. Harrington*, 167 Wn.2d at 664 (2009). Such social contact "occupies an amorphous area in our jurisprudence, resting someplace between an officer's saying 'hello' to a stranger on the street and, at the other end of the spectrum, an investigative detention." *State v. Harrington*, 167 Wn.2d at 664. WASH. CONST. art. I, § 7 does not forbid social contact between police and citizens. *State v. Harrington*, 167 Wn.2d at 665.

To discern whether an encounter is mere social contact or an investigative

detention, the Supreme Court of Washington has embraced nonexclusive examples given

by the United States Supreme Court in *United States v. Mendenhall*, 446 U.S. at 554-55:

> [T]he threatening presence of several officers, the display of a
> weapon by an officer, some physical touching of the person of the citizen,
> or the use of language or tone of voice indicating that compliance with the
> officer's request might be compelled.

*Quoted in State v. Harrington*, 167 Wn.2d at 664; *State v. Young*, 135 Wn.2d at 512

(1998). "In the absence of some such evidence, otherwise inoffensive contact between a

member of the public and the police cannot, as a matter of law, amount to a seizure of

that person." *United States v. Mendenhall*, 446 U.S. at 555 (1980).

Even when an initial contact does not amount to a seizure, it may "mature" or

"transform" into a seizure if the officer's actions ultimately create a situation when the

individual no longer feels free to leave. *Florida v. Royer*, 460 U.S. 491, 503, 103 S. Ct.

1319, 75 L. Ed. 2d 229 (1983); *State v. Richardson*, 64 Wn. App. 693, 697, 825 P.2d 754

(1992). A series of police actions may meet constitutional muster when each action is

viewed individually but may nevertheless constitute an unlawful search or seizure when

the actions are viewed cumulatively. *State v. Harrington*, 167 Wn.2d at 668.

Despite the United States Supreme Court's rejection of per se rules under Fourth

Amendment jurisprudence, Washington courts have adopted some concrete principles.

On the one hand, police activities such as engaging a citizen in conversation, identifying

15

themselves as officers, or simply requesting identification do not convert a casual encounter into a seizure. *State v. Knox*, 86 Wn. App. 831, 838, 939 P.2d 710 (1997), *overruled on other grounds by State v. O'Neill*, 148 Wn.2d 564 (2003). Under Washington law, officers may request identification, including date of birth, and check for outstanding warrants during a social contact. *State v. Armenta*, 134 Wn.2d at 11 (1997); *State v. Hansen*, 99 Wn. App. 575, 577, 994 P.2d 855 (2000). During such contact, the officer need not warn the citizen that he has the right to remain silent or walk away. *State v. Mote*, 129 Wn. App. at 281 (2005). Nor does a seizure automatically occur because an officer is in uniform or carrying a firearm. *State v. Belanger*, 36 Wn. App. 818, 820, 677 P.2d 781 (1984).

On the other hand, a seizure occurs if the officer orders the person to sit or wait while he checks the person's warrant status. *State v. Ellwood*, 52 Wn. App. at 73 (1988). When an officer commands a person to halt or demands information from the person, a seizure occurs. *State v. O'Neill*, 148 Wn.2d at 581 (2003); *State v. Beito*, 147 Wn. App. at 509 (2008).

More importantly, a seizure occurs when the police immobilize a defendant without any other action. *State v. Beito*, 147 Wn. App. at 509-10; *State v. Coyne*, 99 Wn. App. 566, 570, 995 P.2d 78 (2000); *State v. Ellwood*, 52 Wn. App. at 73. In *State v. Coyne*, 99 Wn. App. at 573, this court wrote, in dicta, that an encounter ripens into a seizure if the officer "blocks the defendant from leaving." In *Michigan v. Chesternut*,

16

486 U.S. 567, 575, 108 S. Ct. 1975, 100 L. Ed. 2d 565 (1988), the nation's high Court observed that operation of a patrol car in an aggressive manner to block the defendant's course or otherwise control the direction or speed of his movement is a factor in finding a seizure.

In Otoniel Carriero's appeal, the State contends that the degree of officer intrusion amounted only to social contact because, when the officers approached the Monte Carlo, they did not draw weapons, did not raise their voices, cordially asked the car occupants about their activities, politely asked for identification, did not insist on Carriero showing his hands, and did not touch the person of Carriero. We agree with the State that all of these factors lean in favor of social contact. Nevertheless, the State fails to observe other focal facts.

The two Yakima Police Department patrol cars blocked the exit of Otoniel Carriero's Monte Carlo. We do not understand how the dissent can conclude that the two patrol cars did not block the exit of the Monte Carlo when the trial court found, in finding of fact 10 that, due to the narrowness of the alley, two vehicles could not pass each other. After leaving Carriero no path for his car, the two uniformed officers, with guns in holsters, stood immediately adjacent to the car doors. Officers learn the concept of "command presence," which entails always capturing control of the situation for their safety. When Officer Scott Gronewald stood next to the driver's door, Gronewald blocked Carriero's egress from the car. If Carriero opened the door, the door would

17

likely strike Officer Gronewald. Gronewald testified he might charge Carriero with assault if Carriero opened the door. Thus, the dissent misunderstands the circumstances when highlighting the fact that Carriero never sought to leave his car. Anyway, an attempt to escape the presence of law enforcement has never been a predicate to a seizure.

The two Yakima Police Department officers asked to view identification of Carriero and his companion. The officers never suggested to Carriero or his friend that either might ignore the instruction or leave the scene. We expect that the officers would have remained next to the car doors until Carriero and his friend cooperated. The totality of the circumstances compelled Otoniel Carriero to remain in his car, cooperate with law enforcement, and obey the direction to deliver his identification. No reasonable person would have deemed himself free to ignore the officers. No reasonable person would have ignited his car's engine and sought to maneuver out of a tight alleyway to evade speaking with the officers. Thus, the officers seized Carriero.

We deem *State v. Crane*, 105 Wn. App. 301 (2001) helpful. In *Crane*, the officer parked his patrol car in a driveway behind the car in which Shawn Crane sat as a passenger. We do not know the extent to which the officer's car blocked the forward car. As Crane exited the vehicle, the officer asked for identification and checked for warrants. According to this court, Crane had entered an area secured by law enforcement. The court did not deem the blocking of the car alone to be a seizure, but the seizure occurred

18

because of the blocking of the car and the request for identification.

In *State v. Beito*, 147 Wn. App. 504 (2008), this court held that a law enforcement officer seized Curtis Beito, a vehicle passenger, when the officer stood outside the passenger door and thereby blocked Beito's exit while the driver was told she could not leave. A reasonable person would not have considered himself free to leave or free to decline the officer's request for identification.

Courts universally hold that law enforcement's blocking the exit of the accused's car constitutes a significant, if not a decisive, factor in finding a seizure. *United States v. Packer*, 15 F.3d 654, 657 (7th Cir. 1994); *United States v. Clardy*, 819 F.2d 670, 672 (6th Cir. 1987); *United States v. Kerr*, 817 F.2d 1384, 1386-87 (9th Cir. 1987); *United States v. Rosas-Herrera*, 816 F. Supp. 2d 273, 277 n.4 (M.D. N.C. 2011), *aff'd*, 499 F. App'x 249 (4th Cir. 2012); *United States v. Stanfield*, 906 F. Supp. 300, 302-03 (D. Md. 1995), *aff'd*, 109 F.3d 976 (4th Cir. 1987); *In re O.S.*, 2018 IL App. (1st) 171765, 112 N.E.2d 621, 425 Ill. Dec. 258, *appeal denied*, 110 N.E. 3d 189 (2018); *State v. Caplinger*, 2018-Ohio-3230, 118 N.E.3d 446 (2018); *State v. Edmonds*, 323 Conn. 34, 145 A.3d 861 (2016); *State v. Clark*, 297 Conn. 1, 7-8, 997 A.2d 461 (2010); *State v. Willoughby*, 147 Idaho 482, 487-88, 211 P.3d 91 (2009); *State v. Garcia-Cantu*, 253 S.W.3d 236 (Tex. Crim. App. 2008); *Riley v. State*, 892 A.2d 370, 374 (Del. 2006); *People v. Thompson*, 337 Ill. App.3d 849, 787 N.E.2d 858, 272 Ill. Dec. 672 (2003); *Commonwealth v. Mulholland*, 794 A.2d 398, 401-02 (Pa. Super. Ct. 2002); *State v. Roberts*, 1999 MT 59,

293 Mont. 476, 977 P.2d 974; *State v. Struhs*, 940 P.2d 1225, 1227-28 (Utah Ct. App. 1997); *Commonwealth v. Stoute*, 422 Mass. 782, 789, 665 N.E.2d 93 (1996); *State v. Fry*, 122 Idaho 100, 102, 831 P.2d 942 (Ct. App. 1991); *Mosby v. State*, 575 So. 2d 304, 306 (Fl. Dist. Ct. App. 1991); *State v. Epperson*, 237 Kan. 707, 714, 703 P.2d 761 (1985); 2 WAYNE R. LAFAVE, SEARCH AND SEIZURE § 9.4(a) n.122 at 596-97 (5th ed. 2012). In *State v. Caplinger*, the Ohio Court of Appeals deduced that a reasonable person would not feel free to leave when her vehicle is surrounded by a police car regardless if the car blocks all paths of exit.

In most, if not all of the cited foreign decisions, one or more other factors, such as the shining of a spotlight, use of emergency lights, illumination of headlamps, the presence of more than one officer, night time, or the officer immediately approaching the accused's vehicle, led to a finding of seizure. We need not decide if Washington should adopt a per se rule that the obstructing of the accused's exit in a car always constitutes a seizure. Other factors, along with the officer's blocking the Monte Carlo's passageway, contribute to our conclusion. Both patrol cars had illuminated headlamps. In *State v. Edmonds*, the Connecticut court found a seizure on the basis of blocking the car's exit in addition to the shining of headlamps. Otoniel Carriero's encounter with police transpired at 2 a.m. In *State v. Garcia-Cantu*, the Texas court deemed the blocking of the vehicle by patrol cars in the early morning hours more coercive because of the accused's vulnerability at this hour and the lack of a public to observe the encounter. Officer Scott

20

Gronewald immediately walked to Carriero's side window. In *State v. Roberts*, the Montana court found a seizure when an officer pulled into a driveway, blocked the accused's exit, immediately exited his patrol car, and approached the accused's car. Two officers approached Carriero's Monte Carlo. In *United States v. Stanfield*, the federal district court found a seizure when two police officers blocked a defendant's car and then approached the car from both sides.

The State posits the principle that, when an officer subjectively suspects the possibility of criminal activity but lacks suspicion justifying an investigative detention or a *Terry* stop, the officer contact does not constitute seizure. The State cites *State v. O'Neill*, 148 Wn.2d at 574-75 (2003) for its proposition. Nevertheless, *O'Neill* stands for a contrary proposition. Under *O'Neill*, whether a seizure occurs does not turn upon the officer's suspicions. *State v. O'Neill*, 148 Wn.2d at 575. If we accepted the State's contention, officers could detain anyone at will for questioning and demand answers without any cause or reasonable suspicion.

### Reasonable Suspicion

Because we hold that Officers Garrett Walk and Scott Gronewald seized Otoniel Carriero, we must determine if the officers held justification for the seizure. The officers possessed no arrest or search warrant. In general, warrantless seizures are per se unconstitutional, and the burden falls on the State to demonstrate that a warrantless seizure falls into a narrow exception to the rule. *State v. Doughty*, 170 Wn.2d 57, 61, 239

P.3d 573 (2010). These exceptions are purportedly "jealously and carefully drawn." *State v. Doughty*, 170 Wn.2d at 61.

A brief investigatory seizure, commonly referred to as a *Terry* stop, is one such exception to the warrant requirement. *Terry v. Ohio*, 392 U.S. 1 (1968). Under this exception, a police officer may, without a warrant, briefly detain an individual for questioning if the officer has reasonable and articulable suspicion that the person is or is about to be engaged in criminal activity. *State v. Fuentes*, 183 Wn.2d 149, 158, 352 P.3d 152 (2015); *State v. Smith*, 145 Wn. App. 268, 277, 187 P.3d 768 (2008). The State relies on the *Terry* exception. The State does not argue plain view or open view.

A valid *Terry* stop requires that the officer have a well-founded, reasonable suspicion that criminal activity is afoot based on specific and articulable facts. *State v. Fuentes*, 183 Wn.2d at 158. This court looks at the totality of the circumstances known to the officer at the time of the stop when evaluating the reasonableness of the officer's suspicion. *State v. Glover*, 116 Wn.2d 509, 514, 806 P.2d 760 (1991).

Washington courts have repeatedly held that a person's presence in a high-crime area late at night does not, by itself, give rise to a reasonable suspicion to detain that person. *State v. Fuentes*, 183 Wn.2d at 161 (2015); *State v. Doughty*, 170 Wn.2d at 62; *State v. Larson*, 93 Wn.2d 638, 645, 611 P.2d 771 (1980); *State v. Crane*, 105 Wn. App. at 312 (2001); *State v. Ellwood*, 52 Wn. App. at 74 (1988). Instead, the circumstances must suggest a substantial possibility that the particular person has committed a specific

22

crime or is about to do so. *State v. Martinez*, 135 Wn. App. 174, 180, 143 P.3d 855 (2006). An inarticulate hunch alone does not warrant police intrusion into people's everyday lives. *State v. Doughty*, 170 Wn.2d at 63. Innocuous facts do not justify a stop either. *State v. Armenta*, 134 Wn.2d at 13 (1997).

Although not cited to by either party, our Supreme Court's recent decision in *State v. Weyand*, 188 Wn.2d 804, 399 P.3d 530 (2017) is instructive. Richland Officer Bryce Henry conducted a *Terry* stop of a car after observing the defendant and another man leave 95 Cullum Avenue at nearly 3:00 a.m. As the men quickly walked toward the car, they looked up and down the street multiple times. Based on these observations and the officer's knowledge of the drug history at 95 Cullum, he stopped the vehicle. After the stop, Corporal Henry ran the defendant's name and discovered he had an outstanding warrant. A search incident to arrest of Wesley Weyand led to the discovery of a capped syringe on his person.

The Washington Supreme Court reversed Wesley Weyand's conviction. The high court noted that the trial court's decision rested primarily on evidence that 95 Cullum was a known drug location. Yet, Corporal Henry did not observe any activity that would lead a reasonable person to believe criminal activity was afoot in or nearby the residence. The court emphasized that reasonable suspicion must be individualized to the person being stopped and police cannot justify a suspicion of criminal activity based on a person's locale in a high-crime area. Our case presents a similar situation as *Weyand*. Yakima

23

Police Department Officers Scott Gronewald and Garrett Walk approached Otoniel

Carriero and his passenger simply because they parked in a high-crime area during early

morning hours and a caller indicated the car did not belong in the neighborhood. Neither

officer testified to any other facts that would lead a reasonable person to believe that

criminal activity was taking place or about to take place at the dead-end of the alley.

The State relies on *State v. Dudas*, 52 Wn. App. 832, 764 P.2d 1012 (1988). In

*Dudas*, a police officer saw Michael Dudas emerge from a dark parking lot late at night

while adjacent businesses were closed for the night. The neighborhood had recently

experienced property crimes. The officer drove up to Dudas, asked him to identify

himself, and explain his presence. The court upheld that this was a justifiable *Terry* stop

based on the totality of the circumstances. The *Dudas* decision may support the State's

position, but *Weyand* comes from the Supreme Court, not the Court of Appeals, and we

follow Supreme Court precedent.

Other cases illustrate the error in *State v. Dudas*. In *State v. Larson*, 93 Wn.2d 638

(1980), officers encountered a car parked in a high-crime area near a closed park late at

night. The car started to pull away as the police car approached. The Supreme Court

found these facts insufficient to create a reasonable suspicion justifying seizure.

Our Supreme Court's ruling in *State v. Doughty*, 170 Wn.2d 57 (2010) also

compels a decision that officers lacked reasonable suspicion to approach Otoniel

Carriero. In *Doughty*, the State argued that Officer Derek Bishop had valid grounds for a

*Terry* stop because: (1) law enforcement's identification of a house as a drug house, (2) complaints from neighbors, (3) Doughty visited the house at 3:20 a.m., and (4) his visit lasted less than two minutes. The Supreme Court held that the facts fell short of the reasonable and articulable suspicion to justify an investigatory stop under both the Fourth Amendment and art. I, § 7.

The State implies that officer safety also justified the seizure of Otoniel Carriero. An officer conducting a valid investigatory stop based on reasonable suspicion may take steps to ensure officer safety. *State v. Kennedy*, 107 Wn.2d 1, 12, 726 P.2d 445 (1986). Nevertheless, a valid stop is a precondition. If the officer has no basis to stop the person, officer safety concerns do not come into play. *State v. Kennedy*, 107 Wn.2d at 12; *State v. Weyand*, 188 Wn.2d at 811. In other words, law enforcement officers cannot create reasonable suspicion by claiming officer safety. Officers Scott Gronewald and Garrett Walk could have avoided any risk to their safety by declining to enter the alleyway since they lacked cause to suspect any criminal activity therein. The officers could have, if possible, monitored the activity of Carriero from a safe distance until they observed criminal activity or concluded that Carriero and his friend intended no unlawful behavior.

In earlier decisions when the Supreme Court deemed insufficient evidence to exist to convict after the granting of a motion to suppress under the fourth amendment, the court remanded with directions to dismiss. See *State v. Budd*, 185 Wn.2d 566, 582, 374 P.3d 137 (2016). The state high court recently directed the court of appeals to remand for

25

further proceedings to allow the trial court to determine whether the State may proceed with the prosecution without the suppressed evidence. *State v. McKee*, __ Wn.2d __, __ P.3d ___ (April 18, 2019). We are unaware of any evidence available to convict Otoniel Carriero after granting his motion to suppress, but, in compliance with *McKee*, we remand with directions to the trial court to suppress evidence of the firearm being present in Carrerio's car.

## CONCLUSION

The Yakima Police Department officers lacked reasonable suspicion to seize and confront Otoniel Carriero. Since Officer Scott Gronewald saw Carriero's pistol as a result of the unlawful seizure, evidence of the presence of the pistol must be suppressed. We reverse Carriero's conviction for unlawful possession of a firearm and remand with directions to the trial court to exclude as evidence the firearm being inside Carrerio's vehicle.

_____
Fearing, J.

I CONCUR:

_____
Pennell, A.C.J.

26

No. 35560-8-III

FEARING, J. (concurrence) — As noted in the majority opinion, the United States

Supreme Court, in *United States v. Mendenhall*, 446 U.S. 544, 100 S. Ct. 1870, 64 L. Ed.

2d 497 (1980), established a test for what constitutes a seizure, a test that courts,

including Washington courts when applying the state constitution, employ today. A

seizure occurs when, "in view of all of the circumstances surrounding the incident, a

reasonable person would have believed that he was not free to leave." *United States v.*

*Mendenhall*, 446 U.S. at 545. Nevertheless, the high Court omitted any direction

regarding what steps courts should undertake when divining the beliefs, thoughts, fears,

or conclusions of the hypothetical reasonable person as to whether he or she is free to

leave when contacted by a law enforcement officer.

Since *Mendenhall*, appellate courts have adjudged themselves capable, with only

input from other courts, to assess when a reasonable person deems himself seized, on the

one hand, or free to leave the presence of a law enforcement officer, on the other hand. I

deem this approach mistaken and arrogant. This approach further distances the law from

laypeople and reality, particularly the reality experienced by disadvantaged people.

Appellate judges, who occupy an isolated, privileged campanile, are the last persons to

understand the thinking of any person, let alone a reasonable person, who inhabits an inner city neighborhood labeled by law enforcement as a high-crime area. Appellate judges, unlike laypeople, understand their constitutional right to ignore law enforcement officers under many circumstances. Appellate judges, except in a rare instance of a traffic stop, will not be confronted by law enforcement officers and thereby can avoid the experience of a jittering heart or pressure in the hollow of the stomach to comply with officer requests.

_____
Fearing, J.

No. 35560-8-III

KORSMO, J. (dissenting) — Since the trial court's determination that there was no seizure is borne out by the court's findings, I would affirm. There is no reason for concluding as a matter of law that a seizure occurred here.

The law governing our review is not in dispute, but it is what drives my view of the correct outcome. The determination of whether a seizure has occurred is a mixed question of fact and law. *State v. Armenta*, 134 Wn.2d 1, 9, 948 P.2d 1280 (1997). In contrast, we review factual determinations for substantial evidence and we review conclusions as a matter of law, i.e., de novo. *Id.* As a result of the trial court's opportunity to judge witnesses, we defer to its factual findings and accept them if supported by the evidence. *State v. Hill*, 123 Wn.2d 641, 646-47, 870 P.2d 313 (1994). It is the defendant's burden to establish that he was seized. *State v. Crane*, 105 Wn. App. 301, 309, 19 P.3d 1100 (2001).

The problem here is that the majority draws a conclusion that the officers "blocked" Mr. Carriero from the court's factual determination that the officers were parked in a place where the defendant could not drive past them if he had been inclined to

attempt to leave.[1] Clerk's Papers (CP) at 38. They read too much into that factual finding. If he was in fact "blocked," it was a function of geography, the officers' prudent parking decision, and his own choice of parking location. He never expressed any desire to leave.

Mr. Carriero and his passenger were parked, with the engine and lights off, at the end of a very long alleyway that had access in only one direction to a street. CP at 37-38. The photograph in evidence indicates that 10-12 buildings, primarily residences,[2] line each side of the alleyway, although not all of those properties appear to accommodate vehicle access to the alley. CP at 35. Review of that photograph, in conjunction with the court's finding, suggests that there are probably places where two cars could get past each other in some spots, but certainly not in all locations.

---

[1] Some of the confusion between our two opinions appears to arise from using different meanings for the word "block." The essential difference is between "prevent" and "impede." For instance, if the officers had purposely parked perpendicular to Mr. Carriero, thereby closing the alleyway, a reasonable person could conclude that the officers intended to prevent his car from departing. The majority infers that intention from the trial courts finding. My reading of that finding is that the officers properly parked in the alley and thereby impeded the ability of others to drive around them. If the trial judge had intended the former view of the evidence, he undoubtedly would have concluded that officers intentionally blocked in the defendant. However, he did not, so neither will I.

[2] Some of the larger structures could be apartment buildings or commercial buildings, but the photograph does not allow the unfamiliar viewer to discern their nature.

2

However, the determination that Mr. Carriero could not get past the police vehicles tells us little about whether they seized him by parking where they did. The trial court concluded otherwise and I think that conclusion is borne out by the circumstances. It was not prudent to walk nearly a block down a narrow dark alley toward an uncertain situation. It was prudent to drive to the scene to investigate the complaint since that was the only way the officers could safely approach the parked car. The officers then needed to park in a manner that illuminated the scene, and they did so without using their "takedown" or emergency lights, and there is no indication they used their lighting in a manner that would make a reasonable person believe he or she had been seized.[3]

The question then is whether they purposely blocked Mr. Carriero in such that a reasonable man in Mr. Carriero's shoes would believe he had been seized. The trial court made no finding suggesting that the officers intended to block Mr. Carriero in, and the evidence likewise does not suggest that a reasonable person would believe he was seized by the officers parking where they did. Any area resident who parked in the alley that evening likely would have blocked in both Mr. Carriero and the officers.[4] There is no

---

[3] *Cf. State v. Gantt*, 163 Wn. App. 133, 139-41, 257 P.3d 682 (2011).

[4] The record does not indicate whether or not parking is permitted in the alley. Assuming that Mr. Carriero was lawfully parked in the alley, then anyone else could likewise have parked in an appropriate place. If parking was not permitted, as seems likely, then the officers had an additional reason to check out Mr. Carriero's car.

3

reason to conclude that the mere act of parking in that particular alley seized all vehicles parked south of any "blocking" vehicle.

The case on which the majority relies, *Crane*, is not helpful on this issue. There an officer watched a house while other officers obtained a search warrant. 105 Wn. App. at 304. When a car pulled into the driveway of the house, the officer pulled in behind the car and parked his vehicle; he then prevented[5] the car's occupants from entering the house. *Id.* at 304-05. Obtaining their identification, he held it while calling in a warrants check. *Id.* The trial court concluded that the defendant was not seized, but a divided Division Two panel concluded otherwise. The defendant argued three facts in support of his argument: the officer (1) told him to stop, (2) asked for identification, and (3) ran the warrants check. *Id.* at 308-09. The *Crane* majority reasoned that pulling in behind the car and asking Mr. Crane to stop did not constitute a seizure. *Id.* at 310. However, when the officer obtained identification and called in a warrants check, "the situation changed." *Id.* The majority then concluded that "the circumstances would cause a reasonable person to conclude that he was not free to leave." *Id.* at 311.

Notably lacking in the *Crane* majority's discussion of the relevant facts was any analysis of the significance of the officer's parking location. While the fact that the

---

[5] A factual dispute over whether the officer "told" or asked the vehicle's occupants not to enter the house was resolved in the officer's favor. *State v. Crane*, 105 Wn. App. at 306.

officer *parked* in the driveway behind the car that had arrived was mentioned, there was no discussion of that fact as a part of the majority's seizure analysis. Indeed, whether the officer even *blocked* the vehicle in or not was simply not mentioned. One cannot conclude that the officer in *Crane* blocked the vehicle when he parked behind it. *Crane* simply does not aid the majority here.

Unlike *Crane*, neither Mr. Carriero nor his passenger tried to leave their parked car.[6] Also unlike *Crane*, the officers did not seize or hold the identification information while a records check was conducted. Rather, they held it only long enough to record the information before returning the identification and walking to the patrol car to make the records check. The act of returning the identification immediately, along with lack of any finding that the officers purposely "blocked" the car when they parked as they did, supports the trial court's conclusion that Mr. Carriero was not seized prior to the discovery of the warrant and subsequent view of the weapon.[7]

This was a close case and I would have affirmed the trial court if it had reached a contrary result. I believe that the trial court's factual determinations require us to defer to

---

[6] Curiously, the majority also suggests that the officers "blocked" Mr. Carriero by standing outside the car door in order to talk to him. They cite no authority for this novel view of traffic stop protocol.

[7] Accordingly, I need not reach the issue of whether or not reasonable suspicion existed to conduct an investigative stop, although I believe the record also supports the trial court's conclusion on this point.

its quasi-factual conclusion as to the nature of the alleged "blocking." The majority's decision to essentially adopt a per se test ("blocking" + records check = seizure) that reverses the court as a matter of law leads me to dissent.

Korsmo, J.