IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 79233-4-I |
| Respondent, | ) ) ) | DIVISION ONE |
| v. | ) ) | UNPUBLISHED OPINION |
| NICCO DANIEL BLYE, | ) ) | |
| Appellant. | ) ) ) | |

SMITH, J. — Nicco Daniel Blye appeals his conviction for possession of a controlled substance. He contends that the trial court erred by denying his motion to suppress two bags of heroin found in his vehicle. He also contends that because he is indigent, the trial court erred by imposing a criminal filing fee and interest accrual on nonrestitution legal financial obligations (LFOs).

We conclude that the investigative detention of Blye was not supported by reasonable and articulable suspicion and, thus, constituted an unlawful seizure, and that the heroin found in Blye's vehicle was the fruit of the unlawful detention. Therefore, the trial court erred by denying Blye's motion to suppress. Accordingly, we reverse.

FACTS

On the evening of March 26, 2016, Sergeant Jon Elton of the Marysville Police Department was working a patrol shift when he saw a vehicle legally parked on the shoulder of a public road. The vehicle was parked in a location

Citations and pin cites are based on the Westlaw online version of the cited material.

with "frequent criminal activity." At first, the vehicle's lights were on, but as Sergeant Elton drove by, he saw the lights turn off. Sergeant Elton pulled his vehicle behind the parked vehicle, did not block the vehicle's egress, and did not engage his vehicle's emergency lights or siren. He "initiated contact with the vehicle and its occupant because of criminal activity in the area." Blye, who was sitting in the driver's seat, was the sole occupant of the vehicle.

Sergeant Elton later testified that upon approaching the driver's side window,[1] he stood at an angle behind the driver's side door next to the B pillar. He explained that that position allows a better vantage point into the vehicle and allows the driver to open the door freely if they choose. Blye, on the other hand, testified that if he had opened the door, he would have hit Sergeant Elton, who had his hand on his pistol. He also testified that although Sergeant Elton's police vehicle did not block him, if he had tried to drive away, Sergeant Elton would have had to step away from Blye's vehicle.

Sergeant Elton "asked the person in the driver's seat what he was doing." And Blye "responded that he had pulled over to text someone." Sergeant Elton testified that he asked for identification. However, Blye testified that Sergeant Elton demanded it. Blye presented his state identification card—rather than a driver's license—to Sergeant Elton. While standing next to the vehicle, Sergeant Elton held on to Blye's identification card and "ran a records check through

---

[1] Blye testified at the suppression hearing that there were 14 backup officers present and that the officer that approached his vehicle was not Sergeant Elton. However, he does not challenge the trial court's finding that Sergeant Elton was the officer who approached him that night. Thus, we refer to the officer as Sergeant Elton throughout this opinion.

dispatch." Sergeant Elton testified that while running the records check, he recognized Blye's name from his time working with officers who worked undercover in the department's narcotics division. Sergeant Elton asked Blye whether there were any drugs in the car; Blye answered that he had marijuana in the vehicle but no other drugs.

Dispatch then advised Sergeant Elton that there was a warrant for Blye's arrest for "Driving While License Suspended in the Third Degree." Sergeant Elton confirmed the warrant and requested a backup officer. When the additional officer arrived, Blye exited the vehicle and was placed under arrest. Sergeant Elton observed a bag of a brown powdery substance consistent with heroin on the driver's seat where Blye had been sitting. Sergeant Elton later requested a search warrant for the vehicle, which was impounded. The court granted the request, and Sergeant Elton searched the vehicle, removing the bag of suspected heroin he observed earlier and a similar one on the center console.

The State later charged Blye with possession of a controlled substance. Blye moved to suppress the heroin evidence, and the court conducted a CrR 3.6 hearing. Following the hearing, the court concluded that the contact between Sergeant Elton and Blye was a "social contact" but that Sergeant "Elton was permitted to briefly detain [Blye] pursuant to Terry v. Ohio[2] to determine the status of the defendant's driving privilege because he had reason to believe . . . the defendant had recently been driving." The court also concluded that the detention was "a permissible Terry stop, [and] therefore Sgt. Elton's detention by

_____

[2] 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968).

holding the identification card was lawful." Finally, the court determined that Sergeant Elton's observation of "the suspected heroin in the front driver's seat as [Blye] exited[ the vehicle] . . . was sufficient . . . to obtain a search warrant for the vehicle." The court thus denied Blye's motion to suppress the physical evidence.

A jury later found Blye guilty as charged. At sentencing, the court imposed a criminal filing fee and interest accrual on nonrestitution LFOs despite finding Blye indigent. Blye appeals.

ANALYSIS

Denial of Motion To Suppress

Blye contends that the trial court erred by concluding that he was lawfully detained and, thus, by denying his motion to suppress the bags of heroin found in the vehicle. We agree.

"We review the denial of a motion to suppress to determine whether substantial evidence supports the trial court's findings of fact and whether the findings of fact support the trial court's conclusions of law." State v. Boisselle, 194 Wn.2d 1, 14, 448 P.3d 19 (2019). "'Evidence is substantial when it is enough to persuade a fair-minded person of the truth of the stated premise.'" State v. Russell, 180 Wn.2d 860, 866-67, 330 P.3d 151 (2014) (internal quotation marks omitted) (quoting State v. Garvin, 166 Wn.2d 242, 249, 207 P.3d 1266 (2009)). "We review conclusions of law relating to the suppression of evidence de novo." State v. Eserjose, 171 Wn.2d 907, 912, 259 P.3d 172 (2011).

Here, Blye assigns error to only two of the trial court's findings of fact: (f) "Elton stood next to the B pillar of the vehicle away from the driver's door" and

(h) "Elton asked the driver if he would mind handing him his identification." Sergeant Elton testified that he stood next to the B pillar at the door jamb behind the driver's door and that he "asked [Blye] if he would provide his identification" in a conversational tone. Although Blye's testimony conflicted with Sergeant Elton's, the court found Sergeant Elton's testimony "compelling" and made findings in accordance therewith. Because "we defer to the trier of fact on issues of conflicting testimony[ and] witness credibility," State v. Ramirez-Estevez, 164 Wn. App. 284, 294, 263 P.3d 1257 (2011), we conclude that Sergeant Elton's testimony constitutes substantial evidence supporting the trial court's findings. Thus, we consider findings (f) and (h) "binding" on this court and the trial court's remaining unchallenged findings "verities on appeal." State v. O'Neill, 148 Wn.2d 564, 571, 62 P.3d 489 (2003).

We next turn to the trial court's conclusions of law that (1) Blye was not seized until Sergeant Elton held on to Blye's identification and (2) that seizure was a lawful Terry stop and, thus, the evidence found during the subsequent search was not the fruit of an unlawful seizure.

Where, as here, the findings of fact are upheld or verities on appeal, "'the ultimate determination of whether those facts constitute a seizure is one of law and is reviewed de novo.'" State v. Harrington, 167 Wn.2d 656, 662, 222 P.3d 92 (2009) (internal quotation marks omitted) (quoting State v. Armenta, 134 Wn.2d 1, 9, 948 P.2d 1280 (1997)). Blye has the burden of proving that a seizure in violation of his constitutional rights occurred. O'Neill, 148 Wn.2d at 574.

Here, Blye contends that he was seized at the point that Sergeant Elton asked for his identification. We disagree with this contention but agree with Blye that he *was* seized at the point that Sergeant Elton *retained* his identification.

A "'police officer's conduct in engaging a defendant in conversation in a public place and asking for identification does not, alone, raise the encounter to an investigative detention.'" See State v. Young, 135 Wn.2d 498, 511, 957 P.2d 681 (1998) (quoting Armenta, 134 Wn.2d at 11). Here, the trial court found that Sergeant Elton was located away from the driver's door, he had not activated his vehicle's emergency lights or sirens, and he did not demand identification. In other words, the trial court's findings do not include any of the common facts indicative of a seizure, such as "'the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled.'" See Young, 135 Wn.2d at 512 (quoting United States v. Mendenhall, 446 U.S. 544, 554-55, 100 S. Ct. 1870, 64 L. Ed. 2d 497 (1980)). Therefore, the trial court's findings support its conclusion that Blye was not seized when Sergeant Elton asked him for identification.

Blye was seized, however, when Sergeant Elton retained his identification. Specifically, because "[a] police encounter may ripen into a seizure in circumstances, for example, where the police officer retains the identification such that the defendant is not free to leave or becomes immobilized," State v. Beito, 147 Wn. App. 504, 509, 195 P.3d 1023 (2008), we agree with the trial

6

court that an investigative detention, and thus a seizure, occurred when Sergeant Elton retained Blye's identification card to run a records check.

Turning next to whether this seizure was lawful, "a police officer may, without a warrant, briefly detain an individual for questioning if the officer has reasonable and articulable suspicion that the person is or is about to be engaged in criminal activity." State v. Carriero, 8 Wn. App. 2d 641, 663, 439 P.3d 679 (2019). Such a detention is referred to as a Terry stop. In determining the reasonableness of a Terry stop, "a court must evaluate the totality of circumstances presented to the investigating officer." State v. Doughty, 170 Wn.2d 57, 62, 239 P.3d 573 (2010). And the totality of "'[t]he circumstances must suggest a substantial possibility that the particular person has committed a specific crime or is about to do so.'" State v. Moreno, 173 Wn. App. 479, 492, 294 P.3d 812 (2013) (alteration in original) (quoting State v. Martinez, 135 Wn. App. 174, 180, 143 P.3d 855 (2006)). Specifically, "'[i]n justifying the particular intrusion the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion.'" Doughty, 170 Wn.2d at 62 (alteration in original) (quoting Terry, 392 U.S. at 21). And "[t]he State must show by clear and convincing evidence that the Terry stop was justified." Doughty, 170 Wn.2d at 62. We review the court's conclusions of law regarding the Terry stop de novo. Eserjose, 171 Wn.2d at 912.

Here, Sergeant Elton testified that he approached Blye's vehicle because it was "parked in kind of a suspicious area, where a lot of people like to drive

7

through and kind of avoid police contact" and that Blye parked his vehicle in "an area that [Sergeant Elton] usually go[es] to look for criminal activity." Sergeant Elton also testified that "[he] just saw the vehicle was occupied, and when the lights turned off, [he] just kind of felt maybe they're just trying to avoid [police] contact." He further agreed with defense counsel's characterization that the location was "within walking distance of a smoke shop that sells crack pipes." And he testified that after learning Blye's name, he "had prior knowledge . . . about a narcotic activity with Mr. Blye."

In short, according to his own testimony, Sergeant Elton suspected that Blye was involved in a drug crime based solely on Blye's presence in a high crime area and the fact that Blye turned off his headlights. But this amounts to no more than a hunch. And these facts, even taken together, do not support Sergeant Elton's detention of Blye because "'[a] person's presence in a high-crime area at a "late hour" does not, by itself, give rise to a reasonable suspicion to detain that person.'" State v. Diluzio, 162 Wn. App. 585, 590, 254 P.3d 218 (2011) (quoting Doughty, 170 Wn.2d at 62); see also State v. Fuentes, 183 Wn.2d 149, 161, 352 P.3d 152 (2015) ("An officer's hunch does not justify a stop."). Because Sergeant Elton's suspicion was not particularized to Blye's criminal activity or a particular crime, the trial court erred in concluding that the Terry stop was justified. See State v. Z.U.E., 183 Wn.2d 610, 618, 352 P.3d 796 (2015) ("The available facts must substantiate more than a mere generalized suspicion that the person detained is 'up to no good'; the facts must connect the particular person to the *particular crime* that the officer seeks to investigate."

8

(quoting State v. Bliss, 153 Wn. App. 197, 204, 222 P.3d 107 (2009))).

The State disagrees and points out that the trial court determined that the detention was lawful based on Sergeant Elton having "had reason to believe from [all of] the . . . facts that [Blye] had recently been driving . . . [and he] was permitted to briefly detain" Blye to run his identification and determine whether he had a valid driver's license. In other words, the trial court, apparently relying on the totality of the circumstances, formed its own justification for the stop, i.e., that Sergeant Elton had reason to believe Blye had been driving without a license. But Sergeant Elton never testified that he was concerned that Blye was driving without a license or that such a concern informed his decision to detain Blye. In fact, the court itself found that Sergeant "Elton initiated contact with the car and its occupant because of criminal activity in the area." And the *officer* must point to specific and articulable facts that reasonably warrant the investigative detention. That is, although the trial court must consider the totality of the circumstances to determine whether the suspicion relied on by the officer was *reasonable*, the trial court here erred by relying on the totality of the circumstances to divine a suspicion never even articulated by the officer.

In short, Sergeant Elton's warrantless seizure of Blye does not fall within the Terry stop exception. Therefore, we must next consider whether the heroin discovered after Sergeant Elton arrested Blye and obtained a search warrant for the vehicle should have been suppressed as the fruit of that unlawful seizure.

Under the exclusionary rule, "the evidence obtained as a result of [an unlawful] seizure must be suppressed." Moreno, 173 Wn. App. at 491. And

9

"[s]uppression is an integral component of the right to privacy itself, and 'whenever the right is unreasonably violated, the remedy must follow.'" State v. Mayfield, 192 Wn.2d 871, 887, 434 P.3d 58 (2019) (quoting State v. White, 97 Wn.2d 92, 110, 640 P.2d 1061 (1982)). But "our state exclusionary rule applies only to 'fruit of the poisonous tree' and therefore does not operate on a strict 'but for' causation basis." Mayfield, 192 Wn.2d at 891. Instead, "[t]here must be some proximate causal connection between official misconduct and the discovery of evidence for the exclusionary rule to apply." Mayfield, 192 Wn.2d at 891. And "[i]f unconstitutionally obtained information provides the only basis for a warrant, the court must suppress evidence seized under the warrant." State v. VanNess, 186 Wn. App. 148, 154, 344 P.3d 713 (2015). We conclude here that the heroin evidence was the fruit of the poisonous tree and, thus, should have been suppressed.

Doughty is instructive. There, Officer Derek Bishop pulled over Walter Moses Doughty's vehicle after witnessing him exit "a suspected drug house at 3:20 in the morning." Doughty, 170 Wn.2d at 60-61. Officer Bishop ran a records check on Doughty's license, discovered that "Doughty was driving with a suspended license," and arrested him. Doughty, 170 Wn.2d at 60. When he searched Doughty's car incident to arrest, he found a plastic bag filled with a crystal substance that tested positive for methamphetamine. Doughty, 170 Wn.2d at 60. The court concluded that the officer's initial pulling over of Doughty was an unlawful Terry stop because the officer "lacked sufficient specific and articulable facts to seize Doughty." Doughty, 170 Wn.2d at 65. It therefore

10

suppressed the evidence obtained through the subsequent arrest and the search incident to that arrest. Doughty, 170 Wn.2d at 65. In other words, although the officer lawfully arrested Doughty pursuant to a valid warrant, there was a close causal connection between the initial unlawful stop and the subsequent arrest and search.

Similarly, in State v. Johnson, two officers initiated an unlawful detention of Louis Johnson Jr. 8 Wn. App. 2d 728, 733, 745-46, 440 P.3d 1032 (2019). Johnson, who was in the driver's seat, handed the officers an identification card rather than a driver's license, which made the officers "suspicious that his license might be suspended." Johnson, 8 Wn. App. 2d at 734. While running a background check on Johnson, one officer noticed a gun in the vehicle. Johnson, 8 Wn. App. 2d at 734. The officer removed Johnson from the vehicle, and police dispatch soon after informed the officers of an outstanding warrant for Johnson. Johnson, 8 Wn. App. 2d at 734. Johnson was detained, and the State later charged him with unlawful possession of a firearm. Johnson, 8 Wn. App. 2d at 734. However, the trial court suppressed the physical evidence. Johnson, 8 Wn. App. 2d at 734. We affirmed the trial court's suppression. Johnson, 8 Wn. App. 2d at 750.

Here, as in Doughty, Sergeant Elton arrested Blye pursuant to a valid warrant. And, as in Doughty, where the officer found evidence during a lawful search incident to arrest, here, Sergeant Elton found the heroin while searching Blye's vehicle pursuant to a warrant. Nevertheless, as in Doughty, there was a close causal connection between Sergeant Elton's unlawful seizure of Blye and

11

the heroin found in his car. Specifically, Sergeant Elton would not have seen the heroin on the driver's seat had he not arrested Blye pursuant to the warrant he discovered only because he unlawfully seized Blye. And based on the trial court's conclusion that "the suspected heroin [discovered] in the front driver's seat as [Blye] exited[ the vehicle] . . . was sufficient . . . to obtain a search warrant for the vehicle," it is clear that the justification for the search warrant was the heroin on the seat.

Thus, while it is true that once Sergeant Elton learned of Blye's arrest warrant, he "not only had the right but the duty to . . . arrest him," State v. Rothenberger, 73 Wn.2d 596, 599, 440 P.2d 184 (1968), we see little difference between this evidence and the evidence seen by the officers in Johnson: had Sergeant Elton seen the evidence prior to Blye's exiting the vehicle, the evidence clearly would be the result of the unlawful detention and thus taint the search warrant application. In short, while Blye's arrest was lawful and the subsequent search warrant provided a lawful basis to search the vehicle, the search warrant was the fruit of the poisonous tree, and the trial court erred when it denied Blye's motion to suppress the seized evidence.

Furthermore, this case is distinguishable from other cases concluding that evidence obtained after a lawful arrest and pursuant to a search warrant was admissible despite the fact that some aspect of the officer's contact was unlawful. For example, in State v. Gaines, 154 Wn.2d 711, 718, 116 P.3d 993 (2005), the court upheld the admission of physical evidence seized following an unlawful search of a locked trunk because the officers submitted a four-page affidavit for a

search warrant with only one fact obtained from the unlawful search. And in Moreno, the court upheld the admission of evidence seized following a search warrant being issued because the warrant application was based on evidence outside of that which was obtained via the unlawful arrest. 173 Wn. App. at 491. In other words, in Gaines and Moreno, the evidence used to obtain warrants was separate and distinguishable from the evidence that was obtained unlawfully. Here, by contrast, the trial court concluded that the evidence for the search warrant resulted from Sergeant Elton taking Blye into custody. And because Sergeant Elton would not have known that there was an arrest warrant for Blye and therefore would not have taken him into custody had he not unlawfully detained Blye, the evidence used to obtain the warrant is not separate from the unlawful evidence.

Because we reverse Blye's conviction, we do not address Blye's LFO-related arguments.

We reverse.

_____

WE CONCUR:

_____    _____
Andrus, A.C.J.

13